## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

The Penn Mutual Life Insurance
Company,

                Plaintiff,

v.

Wayne H. Bursey, as trustee of the
Charter Oak Trust; the Charter Oak
Trust; J. Edward Waesche; and John
Does 1-10,

                Defendants.

Case No.

Jury Trial Demanded

## **ACTION FOR DECLARATORY JUDGMENT**

Plaintiff, The Penn Mutual Life Insurance Company ("Penn Mutual"), by and through its attorneys, hereby files this Complaint, and in support thereof, avers as follows:

1.      Penn Mutual seeks a declaratory judgment under 28 U.S.C. § 2201, stemming from the procurement of a $4 million insurance policy on the life of Teresa Martinez ("Martinez Policy"). Upon information and belief, the Martinez Policy is void or voidable due to a lack of insurable interest at inception and/or material misrepresentations in the application for the Martinez Policy ("Application").

2.      Penn Mutual also seeks damages as a result of the fraudulent misrepresentations made in connection with the Martinez Policy.

## PARTIES

3.     Penn Mutual is a life insurance company organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pennsylvania.

4.     Defendant Wayne H. Bursey ("Mr. Bursey") is the trustee for the Charter Oak Trust.  Mr. Bursey is a citizen of the State of Connecticut, maintaining an address for service of process at 100 Grist Mill Road, Simsbury, Connecticut 06070.

5.     Defendant Charter Oak Trust ("Trust") is the record owner and beneficiary of the Martinez Policy.  Trust is a citizen of the State of Connecticut, maintaining an address for service of process at 100 Grist Mill Road, Simsbury, Connecticut 06070.

6.     Defendant J. Edward Waesche ("Mr. Waesche") is a life insurance agent. Mr. Waesche is a citizen of the State of Connecticut, maintaining an address for service of process at 173 Lake Avenue, Bloomfield, Connecticut 06002.

7.     John Does 1-10 are certain STOLI promoters whose names and addresses of residences are presently unknown.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), insofar as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between Plaintiff and Defendants.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events giving rise to each of the claims occurred herein.

**ROGIN NASSAU LLC**  •  ATTORNEYS AT LAW
CITYPLACE I  •  HARTFORD, CONNECTICUT 06103-3460  •  (860) 256-6300  •  JURIS NO. 50793

## FACTUAL BACKGROUND

### A. The STOLI Scheme

10.     Upon information and belief, sometime prior to May 23, 2008, Samuel Nunes ("Mr. Nunes") and/or other STOLI promoters approached Teresa Martinez ("Ms. Martinez") and her husband, Ignacio Martinez, to participate in a stranger-originated life insurance ("STOLI") scheme.

11.     The scheme called for elderly individuals to apply for life insurance policies on their own lives with the concealed intent to sell the policies and/or to sell an interest in the policies to a stranger investor in the secondary market.

12.     Mr. Nunes explained that, as part of the scheme, a senior would complete paperwork, which would be evaluated to see whether the senior was healthy enough to qualify.  If so, an insurance policy would be obtained on the life of the senior.  The policy would be funded by some third party.  In exchange for participating, the senior would be paid between $25,000 and $50,000.

13.     Ms. Martinez and her husband completed informational forms provided by Mr. Nunes.  Ms. Martinez was deemed healthy enough to qualify.

14.     Upon information and belief, Mr. Nunes forwarded the information forms to Mr. Waesche, Mr. Bursey, the Trust, and/or certain unknown parties referred to herein as John Does 1-10 (collectively, the "Defendants").

15.     Ms. Martinez was contacted by the Defendants, who requested additional information from her and arranged for her to visit a medical clinic, in furtherance of the STOLI scheme.

**ROGIN NASSAU LLC** • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

16.     Shortly thereafter, Ms. Martinez decided that she did not want to participate in the scheme.  Ms. Martinez informed the Defendants of her decision not to go forward with the process when she next contacted by the Defendants.

**B.     The Application for the Martinez Policy**

17.     Unbeknownst to Ms. Martinez and without her authorization, the Defendants used the information provided by Mr. Nunes to apply to Penn Mutual for a $4 million life insurance policy on the life of Ms. Martinez.  A true and correct copy of the Martinez Policy, which includes the Application and Agent's Underwriting Report, is attached hereto as Exhibit A.

18.     The Defendant completed the Application with the intent to induce Penn Mutual to issue the Martinez Policy.

19.     The Application contained questions, the purpose of which was to discern whether the Martinez Policy was being sought for the purpose of resale in the secondary market.

20.     The Application included the following two questions:

- Have you been involved in any discussion about the possible sale or assignment of this policy to a Life Settlement, Viatical or other secondary market provider?

- Have you in the past 2 years sold a policy to a Life Settlement, Viatical or other secondary market provider?

21.     On the Application, the Defendants answered "No" to both questions restated in paragraph 20, above.

**ROGIN NASSAU LLC** • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

22.     On the Application, the Defendants also answered "No" to the following question: "Will any part of the premium be paid from funds that are borrowed or otherwise financed?"

23.     On the Application, the Defendants indicated that the purpose of the Martinez Policy was "Estate Planning."

24.     On the Application, the Defendants indicated that the primary source of premium funds was "Trust Assets."

25.     On the Application, the Defendant indicated that the Trust was intended to be owner, payor and primary beneficiary of the Martinez Policy, and the Defendants identified Mr. Bursey as the trustee of the Trust.

26.     Mr. Bursey and Mr. Waesche signed the Application on May 23, 2008.

27.     In completing the Application, the Defendants knew that they were required to provide truthful, accurate, and honest responses to the questions presented.

28.     Furthermore, the Defendants knew that Penn Mutual would rely upon the statements recorded in the Application in determining whether to issue the Martinez Policy with the face amount requested or whether to issue it at all.

29.     The Application contained several misrepresentations, including, *inter alia,* the following:

      (a)     The Application falsely stated that there were no discussions about the possible sale or assignment of the Martinez Policy on the secondary market. In fact, sale or assignment on the secondary market was the primary purpose of the Martinez Policy.

**ROGIN NASSAU LLC** • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

(b) The Application falsely stated that the purpose of the Martinez Policy was "Estate Planning." In fact, the Martinez Policy was procured for resale on the secondary market.

(c) The Application falsely stated that Ms. Martinez had a net worth of $7,400,000. In fact, Ms. Martinez's net worth was less than $400,000, consisting of a modular home, a used vehicle, and approximately $200,000 in a CD.

(d) The Application falsely stated that Ms. Martinez had annual income of $321,000. In fact, the Ms. Martinez had no income other than social security benefit payments and interest income on her CD.

(e) The Application falsely stated that the source of funds for the $222,800 annual premium payments was "Trust Assets." The Application also falsely stated that Ms. Martinez had $300,000 in "interest income, dividends, and cap[ital] gains from trust assets." In fact, Ms. Martinez had no ability or desire to fund the $222,800 annual premium, from trust assets or otherwise.

## C. <u>The Agent's Underwriting Report</u>

30. Additionally, the Application contained an Agent's Underwriting Report completed and signed by Mr. Waesche.

31. The Agent's Underwriting Report contained questions, the purpose of which was to discern whether the Martinez Policy was being sought for the purpose of resale in the secondary market.

32. Section A, Question 4 of the Agent's Underwriting Report asked Mr. Waesche "What is the specific need for this coverage?" Mr. Waesche answered "Estate tax liquidity" to this question.

**ROGIN NASSAU LLC** • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

33.     Section A, Question 5 of the Agent's Underwriting Report asked Mr. Waesche "Will any part of the premium for this policy be paid for by funds that are borrowed or otherwise financed?" Mr. Waesche answered "No" to this question.

34.     Section A, Question 6 of the Agent's Underwriting Report asked Mr. Waesche "Have you had any discussion, or do you have any reason to believe that this policy may be sold or assigned to a Life Settlement, Viatical or other secondary market provider?" Mr. Waesche answered "No" to this question.

35.     In Section B, Question 1 of the Agent's Underwriting Report, Mr. Waesche indicated that the Martinez Policy was being applied for as part of the "Charter Oak Trust," a "Welfare Benefit Plan."

36.     Mr. Waesche signed the Agent's Certification on the Agent's Underwriting Report on May 23, 2008.

37.     In completing and signing the Agent's Underwriting Report, Mr. Waesche knew that he was required to provide truthful, accurate, and honest responses to the questions presented.

38.     Furthermore, Mr. Waesche knew that Penn Mutual would rely upon the statements recorded on the Agent's Underwriting Report in determining whether to issue the Martinez Policy with the face amount requested or whether to issue it at all.

39.     The Agent's Underwriting Report contained several misrepresentations regarding the occurrence of discussions concerning the sale and purpose of the Martinez Policy in the secondary market and the source of premium funds, including, *inter alia*, the following:

**ROGIN NASSAU LLC** • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

(a) The Agent's Underwriting Report falsely stated that the "specific need for this coverage" was "Estate tax liquidity." In fact, Ms. Martinez has no need for estate tax liquidity, and the Martinez Policy was procured for resale on the secondary market.

(b) The Agent's Underwriting Report falsely stated that no part of the premium for the Martinez Policy was to be paid by funds that are borrowed or otherwise financed. In fact, Ms. Martinez could not afford and did not desire to pay the $222,800 annual premium.

(c) The Agent's Underwriting Report falsely stated Mr. Waesche had no reason to believe that the Martinez Policy may be sold or assigned to a life settlement, viatical or other secondary market provider. In fact, Mr. Waesche knew that the Martinez Policy was being procured for resale on the secondary market.

(d) The Agent's Underwriting Report falsely stated that that the Martinez Policy was being applied for as part of the Trust, a § 419 Welfare Benefit Plan. In fact, Ms. Martinez was unemployed and could not participate in such a Welfare Benefit Plan.

## D. The 419 Plan

40. In furtherance of the STOLI scheme, the Defendants utilized the Trust, purportedly created in connection with a employer-sponsored employee welfare benefit plan under Section 419(e) of the Internal Revenue Code ("419 Plan"). The purpose of the Trust was to conceal the true purpose of the Martinez Policy and to circumvent the applicable law regarding insurable interest.

## E. Other Financial Misrepresentations

41. In addition to the financial misrepresentations made in the Martinez Application, the Defendant misrepresented Ms. Martinez's finances on other occasions.

ROGIN NASSAU LLC • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

42. In connection with the Application, Penn Mutual received a letter from Mr. Waesche, dated June 18, 2008. In this letter, Mr. Waesche stated, *inter alia*, that Ms. Martinez had a net worth of approximately $7,400,000, earning a conservatively average return of 6% annually. A true and correct copy of Mr. Waesche's letter is attached hereto as Exhibit B.

43. Also in connection with the Application, Penn Mutual received a letter from William Klein, a Certified Public Accountant, dated June 15, 2008. In this letter, Mr. Klein stated that he had "compiled a statement of financial condition of Theresa Martinez" and estimated the net worth of Ms. Martinez to be $7,400,000. A true and correct copy of Mr. Klein's letter is attached hereto as Exhibit C.

44. Also in connection with the Application, Defendants submitted a Confidential Financial Statement to Penn Mutual, dated May 23, 2008. The Confidential Financial Statement states that Ms. Martinez has a net worth of $7,500,000. A true and correct copy of Confidential Financial Statement is attached hereto as Exhibit D.

45. The financial information provided to Penn Mutual in, and in connection with, the Application for the Martinez Policy was misrepresented and overstated, and the financial statements included in the Waesche and Klein letters and Confidential Financial Statement were fabrications.

E. **Penn Mutual Issues the Martinez Policy**

46. Based upon the Application, the Agent's Underwriting Report, and the representations contained in all the documents submitted with the Application, Ms.

**ROGIN NASSAU LLC** • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

Martinez's Application was approved for $4 million in coverage, and the Martinez Policy (Policy No. 8214580) was issued on September 26, 2008.

47.     Upon issuance, the Martinez Policy was delivered to Mr. Waesche in Stamford, Connecticut.

48.     Billing notices and annual statements for the Martinez Policy are sent to the Trust in Simsbury, Connecticut.

49.     The premium payments made on the Martinez Policy originate from the Trust.

## COUNT I

## DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST

50.     Penn Mutual hereby incorporates by reference each and every averment contained in the preceding paragraphs, as if set forth herein at length.

51.     Upon information and belief, the Martinez Policy was issued to, at the behest of, and/or procured in accordance with a plan initiated by STOLI promoters and/or investors, none of whom possessed an insurable interest in the life of Ms. Martinez under applicable law.

52.     Upon information and belief, the purpose of the 419 Plan and Trust was to circumvent the applicable laws regarding insurable interest and to conceal the lack of insurable interest in connection with the Martinez Policy.

53.     Upon information and belief, the purpose of this transaction was to gamble upon the life of the Ms. Martinez.

**ROGIN NASSAU LLC** • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

54. Accordingly, Penn Mutual is entitled to a judicial declaration whether the Martinez Policy lacked an insurable interest at inception and is therefore void *ab initio* or voidable.

55. If it is declared that the policy is invalid, Penn Mutual is entitled to a judicial declaration whether the Defendants and/or others are estopped from seeking a return of the premiums paid in connection with the Martinez Policy.

56. To the extent that the Defendants and/or others are not estopped from seeking a return of premiums, Penn Mutual is entitled to equitable relief in the form of a declaration that Penn Mutual is entitled to offset any return of premiums by the costs it has incurred in connection with the Martinez Policy.

## COUNT II

## DECLARATORY JUDGMENT – MATERIAL MISREPRESENTATIONS

57. Penn Mutual hereby incorporates by reference each and every averment contained in the preceding paragraphs, as if set forth herein at length.

58. Upon information and belief, there were misrepresentations made to Penn Mutual in the application for the Martinez Policy, including misrepresentations as to the true purpose of the Martinez Policy and as to Ms. Martinez's financial condition.

59. Penn Mutual justifiably relied on these misrepresentations. If the true purpose of the Martinez Policy and/or if the true financial condition of Ms. Martinez had been represented, Penn Mutual would not have issued the Martinez Policy. Thus, the misrepresentations are material.

**ROGIN NASSAU LLC** • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

60. Accordingly, Penn Mutual is entitled to a judicial declaration whether the Martinez Policy was procured through misrepresentations and is therefore void *ab initio* or voidable.

61. If it is declared that the policy is invalid, Penn Mutual is entitled to a judicial declaration whether the Defendants and/or others are estopped from seeking a return of the premiums paid in connection with the Martinez Policy.

62. To the extent that the Defendants and/or others are not estopped from seeking a return of premiums, Penn Mutual is entitled to equitable relief in the form of a declaration that Penn Mutual is entitled to offset any return of premiums by the costs it incurred in connection with the Martinez Policy.

## COUNT III

## FRAUD

63. Penn Mutual hereby incorporates by reference each and every averment contained in the preceding paragraphs, as if set forth herein at length

64. After a reasonable opportunity for discovery, it will be demonstrated that Defendants procured the Martinez Policy for the purpose of selling it in the secondary market. In addition, Defendants made false representations with the intent that Penn Mutual would rely on them in issuing the Martinez Policy.

65. Defendants knew of the falsity of their representations and made those representations with the intent to defraud Penn Mutual.

66. Each of the false misrepresentations were material to Penn Mutual's decision to issue the Martinez Policy, and Penn Mutual justifiably relied on these

**ROGIN NASSAU LLC** • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

misrepresentations in issuing the Martinez Policy.  Indeed, Penn Mutual would not have issued the Martinez Policy had it known the true facts surrounding Ms. Martinez's limited involvement in the procurement of the Martinez Policy and participation in the Trust, the true purpose of the Martinez Policy, Ms. Martinez's actual net worth and her limited ability to make premium payments, the primary source of the funds for the Martinez Policy, and Defendants' intent to transfer the Martinez Policy or the beneficial interest in the Martinez Policy to a third-party investor in the secondary market.

67.     Penn Mutual has incurred substantial damages as a result of Defendants' wrongful conduct, including, *inter alia*, costs and expenses in the form of commissions and expense allowance paid, acquisition expenses, and fees incurred as a result of investigating the Martinez Policy.

68.     Penn Mutual is also entitled to an award of punitive damages based on Defendants' wanton, malicious, deliberate and/or grossly negligent conduct described herein, including, but not limited to, the fabrication of the intended purpose of the Martinez Policy.

### RELIEF REQUESTED

WHEREFORE, Penn Mutual respectfully requests the entry of an Order by this Court as follows:

A.     Declaring whether the Martinez Policy is void or voidable due to a lack of insurable interest at the inception of the Martinez Policy;

**ROGIN NASSAU LLC** • ATTORNEYS AT LAW
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

B. Declaring whether the Martinez Policy is void or voidable due to material misrepresentations contained in the Application for the Martinez Policy;

C. Declaring whether the Defendants and/or others are estopped from seeking a return of the premiums paid in connection with the Martinez Policy, due to the nature in which the Martinez Policy was procured;

D. Awarding compensatory damages as warranted under law;

E. Awarding punitive damages as warranted under law;

F. Awarding Penn Mutual's attorneys' fees and costs, as determined by the Court, and associated with seeking this judgment; and

G. Awarding such further relief as this Court deems appropriate.

Dated: September 24, 2010

E.J. Robbin Greenspan
Denise Purpura
**ROGIN NASSAU LLC**
185 Asylum Street
Hartford, CT 06103-3460
(860) 278-7480(phone)
(860) 278-2179 (facsimile)
egreenspan@roginlaw.com

*Of Counsel*
James Hoffman
John Bloor
**DRINKER BIDDLE & REATH LLP**
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
(215) 988-2700 (phone)
(215) 988-2757 (facsimile)
James.Hoffman@dbr.com
John.Bloor@dbr.com

*Attorneys for Plaintiff,*
*The Penn Mutual Life Insurance Company*

**ROGIN NASSAU LLC • ATTORNEYS AT LAW**
CITYPLACE I • HARTFORD, CONNECTICUT 06103-3460 • (860) 256-6300 • JURIS NO. 50793

# EXHIBIT A

# The Penn Mutual Life Insurance Company
### Founded 1847

| Insured | TERESA MARTINEZ | $4,000,000 (INCLUDES POLICY VALUE) | Specified Amount |
|---|---|---|---|
| Policy Number | 8 214 580 | SEPTEMBER 26, 2008 | Policy Date |

The Penn Mutual Life Insurance Company agrees, subject to the provisions of this policy, to pay the Death Benefit to the Beneficiary upon receipt of due proof of the death of the Insured while this policy is in force and before the Maturity Date.

The Company also agrees to provide all of the other benefits stated in this policy.

This contract is made in consideration of the payment of premiums as provided in this policy.

The provisions on this and the following pages are part of this policy.

Executed on the Date of Issue by The Penn Mutual Life Insurance Company.

Managing Corporate Counsel
and Secretary

President

**YOU HAVE PURCHASED A FLEXIBLE PREMIUM LIFE INSURANCE CONTRACT. CAREFULLY REVIEW IT FOR LIMITATIONS. THIS POLICY MAY BE RETURNED TO PENN MUTUAL OR THE AGENT WHO SOLD YOU THIS POLICY WITHIN 30 DAYS FROM THE DATE YOU RECEIVED IT. ANY PREMIUM PAID ON IT WILL BE REFUNDED. A RETURN OF THE POLICY AFTER 30 DAYS MAY RESULT IN A SUBSTANTIAL PENALTY, KNOWN AS A SURRENDER CHARGE.**

**READ YOUR POLICY CAREFULLY.** This policy is a legal contract between the Owner and the Company.



## Flexible Premium
## Life Insurance Policy

Death Benefit payable at death prior to Maturity Date
Maturity Benefit Payable at Maturity Date
Flexible premiums payable until Maturity Date
Participating
Supplemental benefits, if any, listed on Page 3

The Penn Mutual Life Insurance Company, Philadelphia, Pennsylvania 19172
FL-06(S)(CA)(60)

# Guide to Policy Sections

1  Policy Specifications
2  Endorsements
3  Qualification as Life Insurance
4  Premiums
5  Lapse and Reinstatement
6  Policy Loans
7  Owner and Beneficiary
8  Death and Maturity Benefits
9  Surrender of Policy

10  Basis of Computation of Values
11  Policy Changes
12  General Provisions
13  Income Payment Options
14  Income Payment Option Tables

Additional Policy Specifications, any supplemental agreements and a copy of any applications follow Section 14

# Alphabetical Index

|  | Section |
|---|---|
| Accumulated Premiums | 4 |
| Accumulated No-Lapse Premiums | 4 |
| Age | 1,12 |
| Annual Report | 12 |
| Assignment | 7,13 |
| Basic Death Benefit | 8 |
| Beneficiary | 1,7 |
| Cash Surrender Value | 9 |
| Cash Value Accumulation Test | 3 |
| Continuation of Insurance | 4 |
| Contract | 12 |
| Cost of Insurance | 10 |
| Cost of Insurance Rates | 10 |
| Date of Issue | 1 |
| Death Benefit | 8 |
| Deferral of Maturity | 12 |
| Expense Charge | 10 |
| Free Look Period | Cover |
| Grace Period | 4 |
| Guideline Premium Test | 3 |
| Income Payment Options | 13 |
| Income Payment Option Tables | 14 |
| Incontestability | 12 |
| Indebtedness | 6 |
| Interest Rate | 10 |

|  | Section |
|---|---|
| Lapse | 5 |
| Loan Interest | 6 |
| Loan Value | 6 |
| Maturity Benefit | 8 |
| Maturity Date | 1 |
| Monthly Anniversary | 12 |
| Monthly Deduction | 10 |
| Net Cash Surrender Value | 9 |
| Net Policy Value | 9 |
| No-Lapse Premium | 1,4 |
| No-Lapse Date | 1 |
| Owner | 1,7 |
| Partial Surrender | 9 |
| Percent of Premium Load | 1 |
| Policy Date | 1,12 |
| Policy Loans | 6 |
| Policy Value | 10 |
| Premiums | 1,4 |
| Rate Class | 1 |
| Reinstatement | 5 |
| Schedule of Benefits | 1 |
| Schedule of Premiums | 1 |
| Specified Amount | 1, 11 |
| Suicide Exclusion | 8 |
| Surrender | 9 |
| Surrender Charge | 9 |

# 1. Policy Specifications ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

INSURED    TERESA MARTINEZ              $4,000,000    SPECIFIED AMOUNT
                                   (INCLUDES POLICY VALUE)

POLICY NUMBER      8 214 580            SEPTEMBER 26, 2008    POLICY DATE

        AGE    78 FEMALE               SPECIAL NONTOBACCO    RATE CLASS

LIFE INSURANCE QUALIFICATION TEST IS GUIDELINE PREMIUM TEST

MATURITY DATE    SEPTEMBER 26, 2051
THE DATE OF ISSUE IS THE POLICY DATE

OWNER AND BENEFICIARY AS PROVIDED IN APPLICATION

SCHEDULE OF BENEFITS _____


FLEXIBLE PREMIUM LIFE INSURANCE            $4,000,000 SPECIFIED AMOUNT

SCHEDULE OF PLANNED PREMIUMS _____


THE INITIAL PREMIUM OF $250425.00 WAS PAID ON THE POLICY DATE FOR 12 MONTHS.
SUBSEQUENT PLANNED PREMIUMS ARE PAYABLE ANNUALLY AS FOLLOWS.

BEGINNING AS OF       PLANNED PREMIUM

   SEP 26, 2009      $242,500.00
   SEP 26, 2047      $113,177.81
   SEP 26, 2048           $.00

NO LAPSE PREMIUM IS SHOWN ON ADDITIONAL POLICY SPECIFICATIONS PAGE 21 CONTD.
THE NO LAPSE DATE IS SEPTEMBER 26, 2051.

THESE PREMIUM AMOUNTS ARE LESS THAN APPLIED FOR, BUT ARE THE
MAXIMUM ALLOWABLE UNDER PRESENT LAW FOR THIS POLICY TO QUALIFY
AS LIFE INSURANCE - SEE SECTION 3 OF THE POLICY.

NOTE:  INSURANCE WILL TERMINATE IF THE PREMIUMS PAID AND THE
INTEREST CREDITED ARE INSUFFICIENT TO COVER THE MONTHLY
DEDUCTIONS, EXCEPT AS PROVIDED IN SECTION 4.

SECTION 7702A OF THE INTERNAL REVENUE CODE OF 1986 ESTABLISHES A CLASS OF LIFE
INSURANCE CONTRACTS DESIGNATED AS "MODIFIED ENDOWMENT CONTRACTS."  THE RULES
RELATING TO WHETHER A POLICY WILL BE TREATED AS A MODIFIED ENDOWMENT CONTRACT
ARE EXTREMELY COMPLEX.  PLEASE CONSULT A QUALIFIED TAX ADVISOR REGARDING YOUR
OWN PERSONAL SITUATION.

# 1. Policy Specifications

## Schedule of Surrender Charges

| | |
|---|---|
| Amount of Premium Used to Calculate Surrender Charge | $100,000.00 |
| Initial Maximum Surrender Charge | $90,000.00 |

### Table of Surrender Charge Factors

| Policy Year | Surrender Factor | Policy Year | Surrender Factor |
|---|---|---|---|
| 1 | 100% | 9 | 41% |
| 2 | 90 | 10 | 34 |
| 3 | 83 | 11 | 27 |
| 4 | 76 | 12 | 20 |
| 5 | 69 | 13 | 13 |
| 6 | 62 | 14 | 6 |
| 7 | 55 | 15 and later | 0 |
| 8 | 48 | | |

## Schedule of Policy Loads and Expense Charges

| | |
|---|---|
| Maximum percent of premium load (applied to each premium applied to the policy) | 35% |
| Maximum per policy monthly expense charge | $9.00 |
| Maximum Expense charge per $1,000 of Specified Amount (for the first 120 months following the policy date) | $.639 |
| Maximum Expense charge per $1,000 of Specified Amount (for the first 120 months following an increase in Specified Amount) | As shown on Page 21 |

## Schedule of Interest Rates

| | |
|---|---|
| Guaranteed Interest Rate | 3% Effective Annual Rate |
| Death Benefit Discount Factor | 1.0024663 |

## Accumulation Tier Rate Interest Rates

| | |
|---|---|
| Annual Premium up to Annual Tier 1 Value | 0.94437% |
| Excess of Tier 1 Value - Annual Tier 2 Value | 0.90445% |

Page 3 (cont'd)

A019488P

## ENDORSEMENT

**Policy Number:** **8214580**

**Insured:** **TERESA MARTINEZ**

### COPY OF POLICY

I certify that, according to the records of the Penn Mutual Life Insurance Company, this is a copy of Policy Number 8214580 as issued by the Company on the life of TERESA MARTINEZ and of any endorsements made on and supplemental agreements and other documents made a part of such policy prior to the date of this certification.

Philadelphia, PA

September 21, 2010

Endorsement No. 1177-01

**The Penn Mutual Life Insurance Company**

*Raymuel S. Carrer*

Vice President
Product Management

IMPORTANT: This agreement is now part of the Policy Contract. Please retain with policy.

## 2. Endorsements
To be made only by Penn Mutual

This page is intentionally

left blank.

A003996E

## 2. Endorsements (continued)
### To be made only by Penn Mutual

**Endorsement — Projections of Benefits and Values**

The Projection of Benefits and Values provision in the General Provisions section of this policy is amended by the addition of the following:

"The first projection in any policy year will be made free of charge in the Annual Report. The fee charged for each subsequent projection will not exceed $25."

Philadelphia, Pennsylvania
(Included at Issue)

The Penn Mutual Life Insurance Company

Vice President and Chief Actuary

Endorsement No. 1438-85

# 3. Qualification as Life Insurance

Your policy must qualify as life insurance under one of the following tests as defined in Section 7702 of the Internal Revenue Code of 1986. The life insurance qualification test for this policy will be the Guideline Premium Test unless otherwise elected in the application. The Life Insurance Qualification Test for this Policy is shown on Page 3. The test may not be changed at anytime after the policy is issued.

The Company will limit premium payments as necessary in order to qualify the policy as a life insurance contract under Section 7702. This contract may be unilaterally amended or modified to satisfy applicable law. The owner shall be permitted to refuse any such change unless noncompliance violates state or federal law. No payment will be returned or refused if it is necessary to continue coverage.

**Guideline Premium Test** - Under this test, the amount of premium that can be paid in a policy year may not exceed the Maximum Premium Limit. The Maximum Premium Limit for a policy year is the largest amount of premium which can be paid in that policy year such that the sum of the premiums paid under the policy will not at any time exceed the guideline premium limitation referred to in Section 7702 of the Internal Revenue Code of 1986, as amended, or as set forth in any applicable successor thereto. The Maximum Premium Limit for the following policy year will be shown on the Annual Report sent to the Owner.

In addition, a minimum margin must exist between the death benefit and the Policy Value. The margin is defined in Section 7702 and is based on the attained age of the Insured. The Basic Death Benefit of the policy will be adjusted accordingly with factors shown in the Table of Death Benefit Factors to satisfy the requirements of this portion of the test. See the Death Benefit Section for further details.

**Cash Value Accumulation Test** - Under this test, the Policy Value cannot at any time exceed the net single premium required to fund the future benefits under the policy. The net single premium is defined in Section 7702 of the Internal Revenue Code. The Basic Death Benefit of the policy will be adjusted accordingly with factors shown in the Table of Death Benefit Factors to satisfy the requirements of this test. See the Death Benefit Section for further details.

The Company reserves the right to restrict Policy transactions as necessary in order to qualify the policy as a life insurance contract under Section 7702. If it is subsequently determined that policy does not satisfy Section 7702, the Company may take whatever steps are appropriate and necessary to attempt to cause such a policy to comply with Section 7702.

# 4. Premiums

**Payment of Premiums** - Premiums are payable while this policy is in force until the Maturity Date. The first premium is due on the Policy Date. Premiums after the first may be paid in any amount and at any interval subject to the following conditions:

(1) No premium payment may be less than $25.
(2) The Company requires submission of evidence of insurability on subsequent premiums that cause an immediate increase in the difference between the Death Benefit and the Policy Value. The increase in the difference between the Death Benefit and the Policy Value will be incontestable with respect to statements made in the evidence of insurability for that increase after the increase has been in force during the life of the Insured for two years from its effective date. Any application for such increase will be attached to and made a part of the policy.
(3) If the Guideline Premium Test is in effect, total premiums paid in any policy year may not exceed the Maximum Premium Limit for that policy year. If excessive premium is paid the Company will refund only the portion that is over the Maximum Premium Limit. No payment will be returned or refused if it is necessary to continue coverage.

A019006P

# 4. Premiums (continued)

Each premium after the first is payable at the Company's Home Office. A receipt signed by the President or the Secretary will be given on request.

**No-Lapse Guarantee** – This policy will not lapse as a result of a Net Cash Surrender Value insufficient to cover the Monthly Deduction for the following month if, on a monthly anniversary prior to the Maturity Date shown on Page 3, the No-Lapse Guarantee Requirement is satisfied.

**No-Lapse Premium** – The No-Lapse Premium for this policy is the amount stated in the Policy Specifications. A change in the Specified Amount, the addition, deletion or change of any supplemental agreements to this policy, or a change in the rate class of the Insured before the No-Lapse Date may result in a change in the No-Lapse Premium.

**No-Lapse Guarantee Requirement** – The No-Lapse Guarantee Requirement is satisfied if, on a monthly anniversary prior to the Maturity Date shown on Page 3, (a) equals or exceeds (b) below, where:

  (a) is the Accumulated Premiums less any outstanding indebtedness; and
  (b) is the Accumulated No-Lapse Premiums.

**Accumulated Premiums** – For purposes of defining the Accumulated Premiums, each premium payment received on the policy will be segregated in the following manner:

  (a) All premiums received during a policy year up to the Annual Tier 1 Value, as shown in the Policy Specifications will be grouped as Tier 1 Payments.
  (b) All premiums received during a policy year in excess of the Annual Tier 1 Value but not exceeding the Annual Tier 2 Value, as shown in the Policy Specifications will be grouped as Tier 2 Payments.
  (c) Once the Annual Tier 2 Value has been attained, any subsequent premiums received during such policy year will be grouped as Tier 3 Payments, as shown in Policy Specifications. Thus, a premium received during a policy year may be grouped such that a portion of the premium is a Tier 1 Payment, a portion of the premium is a Tier 2 Payment, and the remaining portion of the premium is a Tier 3 Payment.

The Accumulated Premiums equal the sum of the Tier 1 Amount, the Tier 2 Amount, and the Tier 3 Amount, where:

The Tier 1 Amount as of the Policy Date is equal to the Tier 1 Payments received as of such date. On each monthly anniversary date after the Policy Date while this policy is in force, the Tier 1 Amount is the sum of:

  (a) The Tier 1 Amount on the preceding monthly anniversary;
  (b) One month's interest on (a) using the Tier 1 Accumulation Rate as shown in the policy specifications;
  (c) Tier 1 Payments received since the preceding monthly anniversary;
  (d) Interest on (c) from the date of receipt in the Home Office to the monthly anniversary, using the Tier 1 Accumulation Rate as shown in the policy specifications;

less the sum of:

  (a) any partial surrender since the preceding monthly anniversary; and
  (b) interest on (a) from the date of partial surrender to the monthly anniversary.

The Tier 2 Amount as of the Policy Date is equal to the Tier 2 Payments received as of such date. On each monthly anniversary date after the Policy Date while this policy is in force, the Tier 2 Amount is the sum of:

  (c) The Tier 2 Amount on the preceding monthly anniversary;
  (d) One month's interest on (a) using the Tier 2 Accumulation Rate as shown in the policy specifications;
  (e) Tier 2 Payments received since the preceding monthly anniversary;
  (f) Interest on (c) from the date of receipt in the Home Office to the monthly anniversary, using the Tier 2 Accumulation Rate as shown in the policy specifications.

A019007P

# 4. Premiums (continued)

The Tier 3 Amount as of the Policy Date is equal to the Tier 3 Payments received as of such date. On each monthly anniversary date after the Policy Date while this policy is in force, the Tier 3 Amount is the sum of:

    (a) The Tier 3 Amount on the preceding monthly anniversary; and
    (b) Tier 3 Payments received since the preceding monthly anniversary.

**Accumulated No-Lapse Premiums** – The Accumulated No-Lapse Premiums are equal to the sum of all No-Lapse Premiums accumulated with the Tier 1 Accumulation Rate as shown in the policy specifications, compounded monthly.

**Continuation of Insurance** - If all premium payments cease, the insurance provided under this policy, including benefits provided by any supplemental agreements attached to this policy, will continue in accordance with the provisions of this policy and any such supplemental agreements for as long as the Net Cash Surrender Value is sufficient to keep it in force, or if (a) is equal to or greater than (b) in the No-Lapse Guarantee Requirement provision above.

**Grace Period** - If, on a Monthly Anniversary prior to the Maturity Date shown on Page 3:

    (a) the Net Cash Surrender Value is insufficient to cover the Monthly Deduction for the following policy month; and
    (b) the No-Lapse Guarantee Requirement is not met,

then a grace period of 61 days will be allowed for the payment of a premium sufficient to keep this policy in force. The payment should be the lesser of the Monthly Deduction or the amount necessary to meet the No-Lapse Guarantee Requirement.

Notice of the amount of premium sufficient to keep this policy in force will be sent to the last known address of the Owner. The notice will be sent at least 30 days before the end of the 61-day grace period. This policy will remain in force during the grace period.

# 5. Lapse and Reinstatement

**Lapse** - If a premium sufficient to keep this policy in force is not paid during the grace period, this policy will lapse at the end of the grace period. At lapse this policy will terminate without value and cease to be in force. Any deduction for the Cost of Insurance after termination will not be considered a reinstatement of the policy nor a waiver by the Company of the termination.

**Reinstatement** - This policy may be reinstated within five years after lapse. A reinstatement is subject to:

    (a) the submission of evidence of insurability satisfactory to the Company;

    (b) the payment or reinstatement of any indebtedness which existed at the end of the grace period; and

    (c) the payment of a premium sufficient to cover the lesser of: (i) the amount necessary to meet the No-Lapse Guarantee Requirement at the date of reinstatement and for three policy months following the reinstatement date, or (ii) an amount to make the Cash Surrender Value positive plus the monthly deductions for the three policy months following the reinstatement date.

The effective date of a reinstatement will be the date of approval by the Company of the application for reinstatement. Such application will be attached to and made a part of the reinstated policy. Following reinstatement, the Policy Date continues to be the date shown on Page 3.

# 5. Lapse and Reinstatement (continued)

The policy value on the date of reinstatement is the sum of:

(a) the policy value at the beginning of the grace period of lapse, including any indebtedness;
(b) interest on (a) at a rate of 3% per year until the date of reinstatement;
(c) any dividend credited to the policy;
(d) interest on (c) at a rate of 3% until the date of reinstatement; and
(e) the payment made upon reinstatement reduced by the percent of premium charge

less the sum of:

(a) the Monthly Deductions for the grace period;
(b) interest on (a) at a rate of 3% per year until the date of reinstatement; and
(c) the Monthly Deduction for the policy month following the date of reinstatement.

The surrender charge set forth in the Surrender of Policy Section will continue to apply to any surrender of this policy following reinstatement. The surrender charge will be calculated based on the policy date and will include the period while the policy was lapsed.

Following reinstatement, the provisions of the No-Lapse Guarantee set forth in Section 4 will again be applicable until the Maturity Date shown on Page 3.

# 6. Policy Loans

The Owner may obtain a loan while this policy is in force during the life of the Insured. The loan, plus any existing indebtedness, may not be greater than the Loan Value of this policy on the date of the loan.

The Company may defer making a loan for up to six months from the date of the loan request. However, a loan to pay a premium due on a policy issued by the Company will not be deferred.

**Loan Value** - The Loan Value is that amount which, with interest at the then current loan interest rate on this policy, will accumulate at the next policy anniversary to (a) less (b), where:

(a) is the Cash Surrender Value on the date as of which the Loan Value is being determined; and
(b) is the Monthly Deductions for the period from the date as of which the Loan Value is being determined until the next policy anniversary.

**Loan Interest** - Loans will bear interest at an adjustable loan interest rate. The loan interest rate will be determined by the Company as of the first day of each calendar year. Such rate will be effective on the date as of which it is determined and will apply to any new or outstanding loan under this policy during the next calendar year.

The loan interest rate will be determined by comparing the loan interest rate in effect for the preceding calendar year with a maximum interest rate defined by law and described below. Any change in the loan interest rate will be subject to the following:

(1) The loan interest rate will be lowered to be equal to or less than the legal maximum interest rate if such legal maximum interest rate is 1/2% or more lower than the loan interest rate in effect during the preceding calendar year.
(2) The loan interest rate may be increased, by at least 1/2% but not higher than the legal maximum interest rate, if the legal maximum interest rate is 1/2% or more higher than the loan interest rate in effect during the preceding calendar year.

A019009P

# 6. Policy Loans (continued)

The legal maximum interest rate used in determining the loan interest rate is the greater of:

(a) Moody's Corporate Bond Yield Average—Monthly Average Corporates as published by Moody's Investors Service, Inc. for the calendar month ending two months prior to the date as of which the loan interest rate is determined; or
(b) the minimum interest rate used to calculate policy values under this policy plus 1 percentage point per year.

If Moody's Corporate Bond Yield Average - Monthly Average Corporates is no longer published, the rate used in its place will be as established by law or by regulation of the insurance supervisory official of the jurisdiction in which this policy is delivered.

The Company will:

(a) notify the Owner of the initial loan interest rate at the time that a loan is made; and
(b) if there is a loan outstanding on this policy, give the Owner advance notice of any increase in the loan interest rate.

Loan interest is due and payable at the end of each policy year. If the interest is not paid when due, it will be added to the loan. It will then bear interest at the rate of interest on loans.

**Indebtedness** - Indebtedness means outstanding loans on this policy plus any loan interest due or accrued. Indebtedness may be repaid in full or in part at any time while this policy is in force during the life of the Insured. This policy is the only security for indebtedness on it. If the indebtedness is greater than the Cash Surrender Value, a notice of pending termination will be mailed to the last known address of the Owner and of any assignee on record. If the excess indebtedness is not paid to the Company, this policy will terminate 61 days after the notice is mailed.

This policy will not terminate in a policy year as the sole result of a change in the rate of interest on loans until the time at which it would otherwise have terminated if there had been no change in the rate of interest on loans during that policy year.

# 7. Owner and Beneficiary

**Owner** - The Owner of this policy is as stated in the application unless changed by a subsequent owner designation or assignment. While this policy is in force before the death of the Insured, the Owner may exercise all of the rights in it without the consent of any other person.

**Beneficiary** - The Beneficiary of this policy is as stated in the application unless changed by a subsequent beneficiary designation on a form provided by the Company. If no other provision is made, the interest of a Beneficiary who dies before the death of the Insured will pass to the Owner.

**Change of Owner or Beneficiary** - The Owner may transfer ownership or change the Beneficiary by filing a written designation at the Home Office on a form provided by the Company. The designation will take effect as of the date it is signed by the Owner, subject to any action taken by the Company prior to the time that the designation is received at the Home Office.

Unless otherwise stated in a designation, the following rules will apply to terms of kinship:

(a) A legally adopted child of any person will be considered the child of the adopting parent.
(b) The brothers and sisters of a person will include those who have only one parent in common with the person, but will not include stepbrothers or stepsisters.
(c) Any reference to children will not include stepchildren and any reference to parents will not include stepparents.

A019010P

# 7. Owner and Beneficiary (continued)

**Assignment -** The Owner may assign this policy while it is in force during the life of the Insured. The rights of the Owner and of any Beneficiary will be subject to the rights of an assignee under the terms of an assignment. No assignment will bind the Company until the original, or a copy signed by the Owner, on a form provided by the Company, has been filed at the Home Office. The Company is not responsible for the effect or the validity of any assignment.

# 8. Death and Maturity Benefits

**Basic Death Benefit -** The Basic Death Benefit prior to the Maturity Date will be as follows:

(1) If the Specified Amount includes the Policy Value, as shown on Page 3, the Basic Death Benefit will be equal to the greater of:
    (a) the Specified Amount; or
    (b) the Policy Value multiplied by an attained age factor based on the attained age of the Insured shown in the Table of Death Benefit Factors.

(2) If the Specified Amount does not include the Policy Value, as shown on Page 3, the Basic Death Benefit will be equal to the greater of:
    (a) the Specified Amount plus the Policy Value; or
    (b) the Policy Value multiplied by an attained age factor based on the attained age of the Insured shown in the Table of Death Benefit Factors.

The Basic Death Benefit on the Maturity Date and beyond will be equal to the Net Policy Value, together with interest at the current rate set by the Company, which will not be less than 3%, compounded annually, until the death of the insured.

**Amount of Death Benefit -** The Death Benefit payable at the death of the Insured while this policy is in force will be equal to the sum of:

(a) the Basic Death Benefit on the date of death of the Insured;
(b) any dividend payable at death of the Insured; and
(c) any benefit provided by a supplemental agreement attached to this policy and payable because of the death of the Insured;

less the sum of:

(a) any indebtedness on this policy at the time of the death of the Insured; and
(b) if the death of the Insured occurs during a grace period, the payment deducted should be the lesser of the Monthly Deductions or the amount needed to meet the No-Lapse Guarantee Requirement.

**Suicide Exclusion -** If the Insured dies by suicide, while sane or insane, within two years from the Policy Date, the Death Benefit will be limited to the premiums paid less any indebtedness and any partial surrenders.

If the Insured dies by suicide, while sane or insane, within two years from the effective date of any increase in the Specified Amount, the Death Benefit with respect to that increase will be limited to the Monthly Deductions made for that increase.

If the Insured dies by suicide, while sane or insane, within two years from the effective date of a reinstatement of this policy, the Death Benefit will be limited to the premiums paid since the reinstatement less any policy loans and partial surrenders made since reinstatement.

A019011P

# 8. Death and Maturity Benefits (continued)

**Payment of Death Benefit** - The Death Benefit will be paid to the Beneficiary in one sum or, if elected, under an income payment option. Settlement shall be made within 60 days after receipt of due proof of death. The Company will require surrender of the policy and proof of the interest of the claimant. The Company will pay interest from the date of death to the date of payment. The interest rate will be determined each year by the Company, but will not be less than a rate of 3% per year compounded annually, or such higher rate as may be required by law.

**Amount of Maturity Benefit** - The Maturity Benefit payable if the Insured is living on the Maturity Date and if this policy is then in force will be equal to the Net Policy Value on that date.

**Payment of Maturity Benefit** - The Maturity Benefit will be paid to the Owner in one sum or, if elected, under an Income Payment Option.

# 9. Surrender of Policy

**Surrender** - The Owner may surrender this policy for its Net Cash Surrender Value by filing a written request with the Company. The Net Cash Surrender Value may be taken in one sum or it may be left with the Company under an income payment option. This policy will terminate and cease to be in force if it is surrendered for one sum.

If this policy is surrendered within 30 days after a policy anniversary, the Net Cash Surrender Value payable on surrender will not be less than the Net Cash Surrender Value on that policy anniversary less any policy loans and partial surrenders made since the anniversary.

The Company may defer the payment of the Net Cash Surrender Value in one sum for up to six months from the date of the surrender request. If the payment is deferred for 30 days or more, it will bear interest at a rate of 3% per year compounded annually while it is deferred.

**Net Cash Surrender Value** - The Net Cash Surrender Value is the Net Policy Value decreased by any surrender charge.

**Net Policy Value** - The Net Policy Value is the Policy Value decreased by any indebtedness on this policy.

**Cash Surrender Value** - The Cash Surrender Value is the Policy Value decreased by any surrender charge.

**Surrender Charge** - The surrender charge for the initial Specified Amount is determined by multiplying (a) times (b), where:

(a) is the appropriate surrender factor from the Table of Surrender Factors determined from the Policy Date; and
(b) is the lesser of:

    (i) the amount of premium used to calculate surrender charge, shown on Page 3;
    (ii) the total premiums paid in the first policy year; and
    (iii) $25.00 per thousand of initial Specified Amount.

The surrender charge for each increase in Specified Amount is based on the amount of the increase and on the attained age of the Insured at the time of the increase. All premiums paid during the first policy year after the effective date of an increase are applied to the increase in Specified Amount for the calculation of the surrender charge. The surrender charge is determined by multiplying (a) times (b), where:

(a) is the appropriate surrender factor from the Table of Surrender Factors determined from the Policy Date; and
(b) is the lesser of:

# 9. Surrender of Policy (continued)

    (i)  the amount of premium used to calculate surrender charge based on the attained age, sex, and class of the Insured at the effective date of the increase;
    (ii)  the total premium paid with the increase during the first policy year after the effective date of the increase; and
    (iii)  $25.00 per thousand of the increase amount.

**Partial Surrender** - The Owner may make a partial surrender of this policy for any portion of the Net Cash Surrender Value that exceeds $250 by filing a written request with the Company. However, no partial surrender may be made for less than $250 and no more than four partial surrenders may be made under this policy in any policy year. No partial surrender may be made which would reduce the Specified Amount to less than $50,000. A processing fee of 2% of the amount surrendered, but not more than $25 will be made for each partial surrender. The processing fee will be deducted from the available Net Cash Surrender Value and will be considered part of the partial surrender.

Any partial surrender will reduce the Policy Value by the amount of the partial surrender. If the Specified Amount includes the Policy Value, the Specified Amount will also be reduced by the amount of the partial surrender that exceeds the difference between the Death Benefit and the Specified Amount. In those instances, the Specified Amount will be reduced in the following order:

(a) The most recent increase in Specified Amount, if any, will be decreased first.
(b) The next most recent increases in Specified Amount, if any, will then be successively decreased.
(c) The initial Specified Amount will then be decreased.

The Surrender Charge will not be reduced as a result of a partial surrender.

The Company may defer the payment of the amount of a partial surrender for up to six months from the date of the partial surrender request. However, a partial surrender to pay a premium due on a policy of the Company will not be deferred. If the payment is deferred for 30 days or more, it will bear interest at a rate of 3% per year compounded annually while it is deferred.

# 10. Basis of Computation of Values

**Policy Value** - On the Policy Date the Policy Value is the initial premium paid less the sum of:

(a) the percent of premium charge, and
(b) the Monthly Deduction for the first policy month.

On each Monthly Anniversary while this policy is in force, the Policy Value is the sum of:

(a) the Policy Value on the preceding Monthly Anniversary;
(b) one month's interest on (a);
(c) any premium paid since the preceding Monthly Anniversary reduced by the percent of premium charge;
(d) interest on (c) from the date of receipt in the Home Office to the Monthly Anniversary; and
(e) any dividend credited to the Policy Value on the Monthly Anniversary;

less the sum of:

(f) any partial surrender since the preceding Monthly Anniversary;
(g) interest on (f) from the date of surrender to the Monthly Anniversary; and
(h) the Monthly Deduction for the following policy month.

# 10. Basis of Computation of Values (continued)

On any date other than a Monthly Anniversary, the determination of the Policy Value will be consistent with the above, except (h), which will only be deducted on a Monthly Anniversary. The value will include pro-rata crediting of interest. There will be no pro-rata debiting of mortality charges.

**Monthly Deduction** - The Monthly Deduction is the sum of:

(a) the Cost of Insurance for the policy month;
(b) the monthly per policy expense charge;
(c) the monthly per $1,000 of Specified Amount expense charge;
(d) the Monthly Deduction for the policy month for any benefits provided by a supplemental agreement made a part of this policy.

**Net Amount at Risk** - The Net Amount at Risk is equal to the Basic Death Benefit at the beginning of the policy month, divided by the Death Benefit Discount Factor, minus the Policy Value at the beginning of the policy month before the Monthly Deduction.

If the Specified Amount does not include the Policy Value, the Policy Value will be allocated to the initial Specified Amount segment in order to determine the Net Amount at Risk.

If there have been any increases in the Specified Amount, the Policy Value will be allocated to the initial Specified Amount segment for determining the Net Amount at Risk. If the Policy Value exceeds the initial Specified Amount, the excess will be allocated to the increases in Specified Amount in the order of the increases. Any increases in the Basic Death Benefit in order to maintain the required minimum margin between the Basic Death Benefit and the Policy Value will be allocated to the most recent increase in Specified Amount.

**Cost of Insurance** - The Cost of Insurance is determined on a monthly basis. It is determined separately for the initial segment as well as for each additional segment created as the result of an increase in the Specified Amount. The total Cost of Insurance for a policy month is calculated as the sum of (a) multiplied by (b) for each segment where:

(a) is the applicable Cost of Insurance Rate divided by 1,000;
(b) is the Net Amount at Risk for that segment.

**Cost of Insurance Rate** - The Cost of Insurance Rate is based on policy year and on the issue age, sex and rate class of the Insured. The Cost of Insurance Rate for any increase in Specified Amount will be based on the policy duration since the effective date of the increase and on the attained age, sex, and rate class of the Insured on the effective date of the increase.

The Cost of Insurance Rate will be determined by the Company as described in the Determination of Nonguaranteed Factors provision. However, these rates will not exceed those shown in the Additional Policy Specifications. Such maximum rates are based on the 2001 Commissioners Standard Ordinary Smoker and Nonsmoker Mortality Table, Age Nearest Birthday.

**Interest Rate** - The minimum interest rate that will be used in calculating the Policy Value under this policy is listed on Page 3.

The actual interest that will be credited to the Policy Value will be at rates set by the Company. Different rates will normally apply to (i) the Net Policy Value and (ii) the portion of the Policy Value represented by indebtedness.

Such rates will not be less than the minimum rate stated above.

A019014P

# 10. Basis of Computation of Values (continued)

The portion of the Net Policy Value that results from premiums paid during a specific calendar month will be credited with interest at the rate set by the Company for premium payments in that month. This credited rate will apply to the portion of the Net Policy Value until the end of the same calendar month in the following year. At the end of such period, that portion of the Net Policy Value will be credited at a new rate set by the Company that will be applicable for the next thirteen months. This procedure will recur at the end of each interest period.

**Expense Charges** - The actual monthly per policy expense charge, monthly per $1,000 of Specified Amount expense charge, and percent of premium charge will be determined by the Company as described in the Determination of Nonguaranteed Factors provision. However, these actual expense charges will not exceed the maximum expense charges stated on Page 3.

The per $1,000 of Specified Amount expense charge may be reduced or eliminated for policies that have been inforce over ten policy years. The reduction or elimination of the per $1,000 of Specified Amount expense charge is due to the fact that the amortization of acquisition expenses is completed by the end of the tenth policy year.

**Determination of Nonguaranteed Factors** - Cost of Insurance Rates, Expense Charges, and Interest Rates will be determined by the Company based on expectations as to future mortality, investment, expense, and persistency experience. The Company will not adjust such rates or charges as a means of recovering prior losses or as a means of distributing prior profits.

**Net Policy Value Reductions** - Monthly Deductions and partial surrenders under this policy will reduce the portion of the Policy Value that results from the most recent premiums paid. A policy loan will be secured by the portion of the Net Policy Value which results from the most recent premiums paid.

**Computation of Values** - All policy values and benefits are equal to or greater than those required by the law of the jurisdiction in which this policy is delivered. A detailed statement of the method of computing reserves and Policy Values has been filed with the insurance supervisory official of that jurisdiction if required.

# 11. Policy Changes

**Right to Make Change** - At any time while this policy is in force after the first policy year, the Owner may request changes as set forth in this section. No change will be permitted that would result in the Death Benefit under this policy not being excludable from gross income due to not satisfying the requirements of Section 7702 of the Internal Revenue Code of 1986, as amended, or as set forth in any applicable successor provision thereto. In addition, each change is subject to the conditions stated. This policy will be amended as the result of any such change.

**Increase in Specified Amount** - An increase in Specified Amount must be applied for on a written application and is subject to the Company's underwriting guidelines in effect at the time of the increase. Evidence of insurability satisfactory to the Company must be submitted. Any increase in the Specified Amount must be for at least $10,000.

**Decrease in Specified Amount** - Any decrease in the Specified Amount must be at least $10,000. The Specified Amount may not be decreased to less than $50,000. No decrease in the Specified Amount may be made in the first policy year. No decrease may be made in the first year following the effective date of an increase in the Specified Amount.

Any decrease in the Specified Amount will become effective on the Monthly Anniversary that coincides with or next follows the receipt by the Company of the request. The decrease in the Specified Amount will be in the following order:

(a) The most recent increase in the Specified Amount, if any, will be decreased first.

# 11. Policy Changes (continued)

(b) The next most recent increases in the Specified Amount, if any, will then be successively decreased.
(c) The initial Specified Amount will then be decreased.

The surrender charge will not change as a result of a decrease in the Specified Amount. No surrender charge will be deducted from the Policy Value upon a decrease in the Specified Amount.

**Change in Specified Amount Option** - If the Specified Amount does not include the Policy Value, a request may be made to change this policy so that the Specified Amount includes the Policy Value. The Specified Amount after the change will be equal to the Specified Amount before the change plus the Policy Value on the date of the change. The effective date of the change will be the Monthly Anniversary that coincides with or next follows the date of receipt by the Company of the request to make the change.

If the Specified Amount includes the Policy Value, a request may be made to change this policy so that the Specified Amount does not include the Policy Value. The Specified Amount after the change will be equal to the Specified Amount before the change less the Policy Value on the date of the change. Any application for such increase will be attached to and made a part of the policy. The effective date of the change will be the Monthly Anniversary that coincides with or next follows the date of receipt by the Company of the request to make the change.

The Specified Amount after the change must be at least $50,000. No more than one change in the Specified Amount option may be made in any policy year.

# 12. General Provisions

**The Contract** - This policy, all applications and any supplemental agreements or amendments constitute the entire contract when attached to and made part of the policy. Only the President, a Vice President, the Secretary, the Chief Actuary, an Actuary or an Associate Actuary may, on behalf of the Company, modify this policy or waive any of its conditions. No agent is authorized to modify this contract or to make any promise as to the future payment of dividends or interest.

At any time the Company may make such changes in this policy as are necessary (i) to assure compliance at all times with the definition of life insurance prescribed by federal income tax law, or (ii) to make the policy conform with any law or regulation issued by any government agency to which it is subject. This contract may be unilaterally amended or modified to satisfy applicable law. The owner shall be permitted to refuse any such change unless noncompliance violates state or federal law.

**Incontestability** - All statements made in any application for this policy are representations and not warranties. No statement will void this policy or be used to contest a claim under it unless the statement is contained in a written application, a copy of which is attached to and made a part of this policy.

This policy will be incontestable after it has been in force during the life of the Insured for two years from the Policy Date. Any increase in the Specified Amount will be incontestable with respect to statements made in the evidence of insurability for that increase after the increase has been in force during the life of the Insured for two years from its effective date.

This policy will be incontestable with respect to statements made in an application for reinstatement after it has been in force during the life of the Insured for two years from the effective date of the reinstatement.

A019016P

## 12. General Provisions (continued)

**Duration of Coverage** - The duration of coverage under this policy will depend on the amount, timing and frequency of premium payments; changes in the Specified Amount or benefits; the interest rates credited or investment return; the cost of insurance rates charged; policy loads, expense charges and the amount and timing of any partial surrenders or policy loans.

**Participation** - This policy will participate in divisible surplus while it is in force except as stated in the Income Payment Options section. The share of such surplus, if any, to be apportioned to this policy as a dividend will be determined each year by the Company.

Any dividend will be credited to the Policy Value, unless the Owner elects to have it paid in cash.

**Policy Date** - The Policy Date shown on Page 3 is the date from which policy years, months and anniversaries are determined.

**Monthly Anniversary** - The Monthly Anniversary is the day in each calendar month that is the same day of the month as the Policy Date.

**Age** - The age shown on Page 3 is the insurance age of the Insured. This is the age of the Insured on the birthday nearest the Policy Date. Attained age means the insurance age of the Insured increased by the number of whole years and months after the Policy Date.

**Misstatement of Age or Sex** - If the age or the sex of the Insured has been misstated, the Death Benefit under this policy will be the amount which would have been provided by the most recent Cost of Insurance charge at the correct age and sex. No adjustment in the Policy Value will be made. Any date that shown on Page 3 that is based on an incorrect age may be changed to be consistent with the correct age.

**Policy Payments** - All payments by the Company under this policy are payable at the Home Office. The Company requires the return of this policy upon surrender for the Net Cash Surrender Value or payment of the Death Benefit.

**Annual Report** - Each year a report will be sent to the Owner which shows the current policy values, premiums paid and deductions made since the last report, any outstanding policy loans, and any other information required by the Insurance Department of the jurisdiction in which this policy is delivered.

**Projection of Benefits and Values** - Upon request, the Company will provide a projection of illustrative future Death Benefits and Policy Values. The request for a projection must be made in writing by the Owner. The Company may charge a fee for this service.

**Deferral of Maturity** - Upon the written request of the Owner, this policy will continue in force beyond the Maturity Date. The Company will not accept any premiums after the Maturity Date. The Death Benefit will be the Net Policy Value on the Maturity Date together with interest at the current rate set by the Company, which will be not less than 3% compounded annually, until the death of the Insured.

## 13. Income Payment Options

**Election of Income Payment Option**—An income payment option may be elected in place of a one sum payment of any amount payable upon the death of the Insured or upon surrender.

# 13. Income Payment Options (continued)

The Owner may elect an income payment option or change a previous election while this policy is in force before the death of the Insured. If no election is in effect at the time of the death of the Insured, the Beneficiary may elect an income payment option before any payment of the Death Benefit has been made and within one year of the date of death.

The amount applied under an income payment option must be at least $5,000. No election may provide for income payments of less than $50 each.

**Option 1—Interest Income**—The Company will hold the amount applied at interest. Interest will be paid monthly, quarterly, semiannually or annually.

**Option 2— Income for a Fixed Period**—The Company will pay the amount applied, with interest, in equal monthly payments for a fixed period. The fixed period may not be greater than 30 years.

**Option 3— Income of a Specified Amount**—The Company will make payments of a specified amount until the total amount applied, with interest, has been paid. The payments may be made monthly, quarterly, semiannually or annually. The final payment may be less than the specified amount. The total of the payments to be made each year must be at least $75 for each $1,000 applied.

**Option 4— Life Income**—The Company will pay equal monthly payments during the life of the option annuitant.

**Option 5— Life Income with Guaranteed Period**—The Company will pay equal monthly payments for a stated guaranteed period and thereafter during the life of the option annuitant. The guaranteed period may be 5 years, 10 years or 20 years.

**Option 6— Life Income with Refund Period**—The Company will pay equal monthly payments during the life of the option annuitant. If necessary, the payments will continue after the death of the option annuitant until the total of all payments made, including a smaller final payment, if required, equals the total amount applied.

**Option 7— Joint and Survivor Life Income**—The Company will pay equal monthly payments during the joint life of two option annuitants and thereafter during the life of the survivor.

**Income Amount—Participation**—The income under Options 1 and 2 will be based on interest at a rate of 1.5% per year compounded annually. The unpaid balance of the amount applied under Option 3 will be credited with interest at a rate of 1.5% per year compounded annually.

Options 1, 2 and 3 will participate in divisible surplus by the payment or crediting of additional interest in such amount, if any, as determined each year by the Company. Additional interest will increase the income payments under Options 1 and 2. Additional interest will lengthen the period during which payments are made under Option 3.

The monthly income under Options 4, 5, 6 and 7 will equal 103% of the monthly income under a comparable single premium nonparticipating annuity issued by the Company at the time that the income payments are to begin. In no event will the monthly income under these life income options be less than the income stated in the Income Payment Option Tables. Options 4, 5, 6 and 7 will not participate in divisible surplus.

**Income Period**—The income period under an option will begin on the date of death or surrender. Income payments under Options 1 and 3 will be made at the end of the payment interval. Income payments under Options 2, 4, 5, 6 and 7 will be made at the beginning of the payment interval.

**Option Annuitant**—Option annuitant means a natural person on whose life the income payments under Options 4, 5, 6 and 7 are based.

A019018P

# 13. Income Payment Options (continued)

The Company may require proof of the age and of the continued life of an option annuitant. If the age or the sex of an option annuitant has been misstated, an appropriate adjustment will be made in the income payments.

**Withdrawal Privilege**—Unless the election states otherwise, the payee under an income payment option may:
(a) before any income payment has been made, withdraw the amount applied under the option; or
(b) withdraw the present value of the income payments to become due during any fixed, guaranteed or refund period; or
(c) withdraw the balance held under Option 1 or 3 plus any accrued interest.

There will be no right to withdraw the present value of the income payments falling due after the guaranteed or refund period under Options 5 and 6. There will be no right to withdraw the present value of any income payments under Options 4 and 7.

The Company may defer the payment of the amount withdrawn for up to six months from the date of a withdrawal request.

**Present Value**—The present value of the income payments under Option 2 will be based on interest at a rate of 1.5% per year compounded annually. The present value of the remaining income payments during a guaranteed or refund period under a life income option will be based on interest at a rate set by the Company at the time income payments are to begin.

**Death of Payee**—Upon the death of the payee under an income payment option, the Company will pay the following to the payee's executors or administrators unless stated otherwise in an election consented to by the Company:

(a) the balance of the amount held under Option 1 or 3 plus any accrued interest; or
(b) the present value of the income payments to become due during the fixed period under Option 2; or
(c) if the option annuitant under Option 5 or 6 has died, the present value of the income payments, if any, to become due during the guaranteed or refund period; or
(d) if any option annuitant under Option 4, 5, 6 or 7 is living, any income payments as they become due during the option annuitant's life plus, upon the death of the option annuitant under Option 5 or 6, the present value of the income payments, if any, to become due during the guaranteed or refund period.

**Assignment— Creditors**—The amount applied under an income payment option and the payments under the option may not be assigned and, to the extent permitted by law, will not be available to anyone who has a claim against the payee.

# 14. Income Payment Option Table

The following tables show the amount of the first monthly income payment for each $1,000 of value applied under an annuity option. "Age" as used in the tables for Options 2,3, and 4 means an adjusted age determined in the following manner from the actual age of the Annuitant on the birthday nearest the date of the first payment:

| Date of First Payment | Adjusted Age |
|---|---|
| Before calendar year 2010 | Actual Age |
| 2010-2019 | Actual age decreased by 1 |
| 2020-2029 | Actual age decreased by 2 |
| 2030 and later | Actual age decreased by 3 |

**Option 1—Interest Income**                  **Option 2—Income for Fixed Period of Years**

| Payment Interval | Amount | Years | Monthly Income | Years | Monthly Income | Years | Monthly Income |
|---|---|---|---|---|---|---|---|
| | | 1 | $83.90 | 11 | $8.21 | 21 | $4.62 |
| Annually | $15.00 | 2 | 42.26 | 12 | 7.58 | 22 | 4.44 |
| | | 3 | 28.39 | 13 | 7.05 | 23 | 4.28 |
| Semiannually | 7.47 | 4 | 21.45 | 14 | 6.59 | 24 | 4.13 |
| | | 5 | 17.28 | 15 | 6.20 | 25 | 3.99 |
| Quarterly | 3.73 | 6 | 14.51 | 16 | 5.85 | 26 | 3.86 |
| | | 7 | 12.53 | 17 | 5.55 | 27 | 3.75 |
| Monthly | 1.24 | 8 | 11.04 | 18 | 5.27 | 28 | 3.64 |
| | | 9 | 9.89 | 19 | 5.03 | 29 | 3.54 |
| | | 10 | 8.96 | 20 | 4.81 | 30 | 3.44 |

# 14. Income Payment Option Table (continued)

**Options 4, 5 and 6—Monthly Life Income**
The amount of income will be based on the age of the option annuitant on the birthday nearest the date of the first payment.

| Age of Option Annuitant | Option 4 Life Income | | Option 5 20 Year Guaranteed Period | | Option 5 10 Year Guaranteed Period | | Option 5 5 Year Guaranteed Period | | Option 6 with Refund Period | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female | Male | Female | Male | Female |
| 15 | $1.99 | $1.92 | $1.98 | $1.89 | $1.97 | $1.90 | $1.98 | $1.91 | $1.95 | $1.88 |
| 16 | 2.01 | 1.94 | 1.98 | 1.91 | 1.99 | 1.92 | 2.00 | 1.93 | 1.97 | 1.90 |
| 17 | 2.03 | 1.95 | 2.00 | 1.92 | 2.01 | 1.93 | 2.02 | 1.94 | 1.99 | 1.91 |
| 18 | 2.05 | 1.97 | 2.02 | 1.94 | 2.03 | 1.95 | 2.04 | 1.95 | 2.01 | 1.93 |
| 19 | 2.07 | 1.99 | 2.04 | 1.96 | 2.05 | 1.97 | 2.06 | 1.98 | 2.03 | 1.95 |
| 20 | 2.09 | 2.01 | 2.06 | 1.98 | 2.07 | 1.99 | 2.08 | 2.00 | 2.05 | 1.97 |
| 21 | 2.11 | 2.02 | 2.08 | 1.99 | 2.09 | 2.01 | 2.10 | 2.01 | 2.05 | 1.98 |
| 22 | 2.13 | 2.04 | 2.10 | 2.01 | 2.11 | 2.02 | 2.12 | 2.03 | 2.09 | 2.00 |
| 23 | 2.15 | 2.06 | 2.12 | 2.03 | 2.13 | 2.04 | 2.14 | 2.05 | 2.11 | 2.02 |
| 24 | 2.17 | 2.08 | 2.14 | 2.05 | 2.15 | 2.06 | 2.16 | 2.07 | 2.13 | 2.04 |
| 25 | 2.20 | 2.10 | 2.17 | 2.07 | 2.18 | 2.08 | 2.19 | 2.09 | 2.16 | 2.06 |
| 26 | 2.22 | 2.13 | 2.19 | 2.10 | 2.20 | 2.11 | 2.21 | 2.12 | 2.18 | 2.09 |
| 27 | 2.25 | 2.15 | 2.22 | 2.12 | 2.23 | 2.13 | 2.24 | 2.14 | 2.21 | 2.11 |
| 28 | 2.27 | 2.17 | 2.24 | 2.14 | 2.25 | 2.15 | 2.26 | 2.16 | 2.22 | 2.13 |
| 29 | 2.30 | 2.19 | 2.27 | 2.16 | 2.28 | 2.17 | 2.29 | 2.18 | 2.26 | 2.15 |
| 30 | 2.33 | 2.22 | 2.30 | 2.19 | 2.31 | 2.20 | 2.32 | 2.21 | 2.27 | 2.18 |
| 31 | 2.36 | 2.24 | 2.33 | 2.21 | 2.34 | 2.22 | 2.35 | 2.23 | 2.29 | 2.20 |
| 32 | 2.39 | 2.27 | 2.36 | 2.24 | 2.37 | 2.25 | 2.38 | 2.26 | 2.35 | 2.22 |
| 33 | 2.42 | 2.30 | 2.39 | 2.27 | 2.40 | 2.28 | 2.41 | 2.29 | 2.38 | 2.26 |
| 34 | 2.46 | 2.33 | 2.43 | 2.30 | 2.44 | 2.31 | 2.45 | 2.32 | 2.40 | 2.27 |
| 35 | 2.49 | 2.36 | 2.46 | 2.33 | 2.47 | 2.34 | 2.48 | 2.35 | 2.44 | 2.32 |
| 36 | 2.53 | 2.39 | 2.50 | 2.36 | 2.51 | 2.37 | 2.52 | 2.38 | 2.45 | 2.35 |
| 37 | 2.56 | 2.42 | 2.53 | 2.39 | 2.54 | 2.40 | 2.55 | 2.41 | 2.49 | 2.36 |
| 38 | 2.60 | 2.46 | 2.57 | 2.43 | 2.58 | 2.44 | 2.59 | 2.45 | 2.50 | 2.42 |
| 39 | 2.65 | 2.49 | 2.62 | 2.46 | 2.63 | 2.47 | 2.64 | 2.45 | 2.57 | 2.45 |
| 40 | 2.69 | 2.53 | 2.66 | 2.50 | 2.67 | 2.51 | 2.68 | 2.52 | 2.60 | 2.48 |
| 41 | 2.73 | 2.57 | 2.70 | 2.54 | 2.71 | 2.55 | 2.72 | 2.56 | 2.65 | 2.52 |
| 42 | 2.78 | 2.61 | 2.74 | 2.58 | 2.76 | 2.59 | 2.77 | 2.60 | 2.66 | 2.54 |
| 43 | 2.83 | 2.65 | 2.79 | 2.62 | 2.81 | 2.63 | 2.82 | 2.64 | 2.72 | 2.55 |
| 44 | 2.88 | 2.69 | 2.83 | 2.66 | 2.86 | 2.67 | 2.87 | 2.68 | 2.76 | 2.61 |
| 45 | 2.94 | 2.74 | 2.88 | 2.71 | 2.92 | 2.72 | 2.93 | 2.73 | 2.79 | 2.62 |
| 46 | 2.99 | 2.79 | 2.93 | 2.76 | 2.97 | 2.77 | 2.98 | 2.78 | 2.80 | 2.68 |
| 47 | 3.05 | 2.84 | 2.98 | 2.80 | 3.03 | 2.82 | 3.04 | 2.83 | 2.88 | 2.70 |
| 48 | 3.11 | 2.89 | 3.03 | 2.85 | 3.09 | 2.87 | 3.10 | 2.88 | 2.90 | 2.76 |
| 49 | 3.18 | 3.09 | 3.09 | 2.92 | 3.16 | 2.92 | 3.17 | 2.93 | 2.97 | 2.79 |
| 50 | 3.24 | 3.00 | 3.14 | 2.95 | 3.22 | 2.98 | 3.23 | 2.99 | 3.05 | 2.85 |
| 51 | 3.31 | 3.06 | 3.20 | 3.00 | 3.29 | 3.04 | 3.30 | 3.05 | 3.06 | 2.94 |
| 52 | 3.39 | 3.13 | 3.26 | 3.06 | 3.36 | 3.11 | 3.38 | 3.12 | 3.16 | 2.95 |
| 53 | 3.47 | 3.19 | 3.32 | 3.12 | 3.44 | 3.17 | 3.46 | 3.18 | 3.17 | 2.99 |
| 54 | 3.55 | 3.26 | 3.39 | 3.18 | 3.51 | 3.24 | 3.54 | 3.25 | 3.28 | 3.05 |
| 55 | 3.63 | 3.34 | 3.45 | 3.24 | 3.60 | $3.32 | 3.62 | 3.33 | 3.29 | 3.10 |
| 56 | 3.73 | 3.41 | 3.52 | 3.30 | 3.68 | 3.39 | 3.71 | 3.40 | 3.35 | 3.17 |
| 57 | 3.82 | 3.50 | 3.58 | 3.37 | 3.77 | 3.47 | 3.81 | 3.49 | 3.41 | 3.29 |
| 58 | 3.92 | 3.58 | 3.65 | 3.44 | 3.87 | 3.56 | 3.91 | 3.57 | 3.49 | 3.30 |
| 59 | 4.03 | 3.68 | 3.72 | 3.51 | 3.97 | 3.64 | 4.02 | 3.67 | 3.55 | 3.43 |
| 60 | 4.15 | 3.78 | 3.79 | 3.58 | 4.07 | 3.74 | 4.13 | 3.77 | 3.64 | 3.45 |
| 61 | 4.27 | 3.88 | 3.86 | 3.65 | 4.19 | 3.83 | 4.25 | 3.87 | 3.71 | 3.51 |
| 62 | 4.40 | 3.99 | 3.93 | 3.73 | 4.30 | 3.94 | 4.38 | 3.98 | 3.83 | 3.62 |
| 63 | 4.54 | 4.11 | 4.00 | 3.81 | 4.42 | 4.05 | 4.52 | 4.09 | 3.88 | 3.67 |
| 64 | 4.69 | 4.23 | 4.07 | 3.88 | 4.55 | 4.16 | 4.66 | 4.22 | 3.96 | 3.80 |

| Age of Option Annuitant | Option 4 Life Income | | Option 5 20 Year Guaranteed Period | | Option 5 10 Year Guaranteed Period | | Option 5 5 Year Guaranteed Period | | Option 6 with Refund Period | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female | Male | Female | Male | Female |
| 65 | 4.85 | 4.37 | 4.14 | 3.96 | 4.69 | 4.28 | 4.81 | 4.35 | 4.06 | 3.92 |
| 66 | 5.02 | 4.51 | 4.21 | 4.04 | 4.83 | 4.41 | 4.98 | 4.49 | 4.20 | 4.01 |
| 67 | 5.20 | 4.68 | 4.27 | 4.11 | 4.98 | 4.55 | 5.15 | 4.64 | 4.35 | 4.04 |
| 68 | 5.39 | 4.83 | 4.33 | 4.18 | 5.13 | 4.69 | 5.33 | 4.80 | 4.52 | 4.24 |
| 69 | 5.60 | 5.00 | 4.39 | 4.26 | 5.29 | 4.84 | 5.53 | 4.97 | 4.59 | 4.25 |
| 70 | 5.82 | 5.19 | 4.44 | 4.32 | 5.45 | 5.00 | 5.73 | 5.15 | 4.67 | 4.49 |
| 71 | 6.05 | 5.39 | 4.49 | 4.39 | 5.62 | 5.17 | 5.95 | 5.34 | 4.75 | 4.58 |
| 72 | 6.30 | 5.61 | 4.54 | 4.45 | 5.79 | 5.34 | 6.17 | 5.55 | 5.05 | 4.77 |
| 73 | 6.57 | 5.85 | 4.58 | 4.50 | 5.96 | 5.52 | 6.42 | 5.78 | 5.13 | 4.85 |
| 74 | 6.85 | 6.11 | 4.62 | 4.55 | 6.14 | 5.71 | 6.67 | 6.02 | 5.34 | 5.06 |
| 75 | 7.15 | 6.39 | 4.65 | 4.60 | 6.32 | 5.91 | 6.94 | 6.28 | 5.45 | 5.15 |
| 76 | 7.47 | 6.69 | 4.68 | 4.64 | 6.51 | 6.11 | 7.22 | 6.55 | 5.63 | 5.28 |
| 77 | 7.82 | 7.01 | 4.71 | 4.67 | 6.69 | 6.31 | 7.52 | 6.84 | 5.81 | 5.48 |
| 78 | 8.19 | 7.36 | 4.73 | 4.70 | 6.87 | 6.52 | 7.83 | 7.16 | 5.94 | 5.76 |
| 79 | 8.59 | 7.74 | 4.75 | 4.72 | 7.05 | 6.73 | 8.15 | 7.49 | 6.22 | 5.86 |
| 80 | 9.01 | 8.16 | 4.76 | 4.75 | 7.22 | 6.93 | 8.49 | 7.84 | 6.25 | 6.05 |
| 81 | 9.47 | 8.60 | 4.78 | 4.76 | 7.39 | 7.13 | 8.84 | 8.21 | 6.69 | 6.16 |
| 82 | 9.95 | 9.09 | 4.79 | 4.76 | 7.56 | 7.33 | 9.21 | 8.60 | 6.77 | 6.57 |
| 83 | 10.47 | 9.61 | 4.79 | 4.79 | 7.71 | 7.52 | 9.58 | 9.01 | 7.13 | 6.77 |
| 84 | 11.02 | 10.18 | 4.80 | 4.80 | 7.86 | 7.69 | 9.97 | 9.44 | 7.32 | 7.10 |
| 85 | 11.61 | 10.79 | 4.81 | 4.80 | 8.00 | 7.86 | 10.36 | 9.87 | 7.45 | 7.33 |
| 86 | 12.24 | 11.45 | 4.81 | 4.81 | 8.13 | 8.01 | 10.76 | 10.32 | 7.80 | 7.53 |
| 87 | 12.91 | 12.16 | 4.81 | 4.81 | 8.24 | 8.15 | 11.17 | 10.77 | 7.91 | 7.98 |
| 88 | 13.61 | 12.91 | 4.81 | 4.81 | 8.35 | 8.27 | 11.57 | 11.22 | 8.47 | 8.08 |
| 89 | 14.37 | 13.71 | 4.81 | 4.81 | 8.45 | 8.38 | 11.97 | 11.66 | 8.65 | 8.40 |
| 90 | 15.17 | 14.55 | 4.81 | 4.81 | 8.54 | 8.48 | 12.37 | 12.09 | 8.77 | 8.69 |
| 91 | 16.01 | 15.43 | 4.81 | 4.81 | 8.61 | 8.56 | 12.77 | 12.51 | 9.60 | 9.02 |
| 92 | 16.91 | 16.34 | 4.81 | 4.81 | 8.68 | 8.64 | 13.15 | 12.92 | 9.75 | 9.42 |
| 93 | 17.86 | 17.29 | 4.81 | 4.81 | 8.74 | 8.71 | 13.53 | 13.31 | 9.82 | 9.73 |
| 94 | 18.87 | 18.29 | 4.81 | 4.81 | 8.80 | 8.76 | 13.91 | 13.69 | 10.90 | 10.21 |
| 95 | 19.96 | 19.32 | 4.81 | 4.81 | 8.84 | 8.81 | 14.28 | 14.05 | 11.21 | 10.50 |
| 96 | 21.13 | 20.42 | 4.81 | 4.81 | 8.88 | 8.85 | 14.64 | 14.41 | 11.65 | 10.92 |
| 97 | 22.41 | 21.60 | 4.81 | 4.81 | 8.90 | 8.89 | 14.99 | 14.75 | 12.14 | 11.37 |
| 98 | 23.84 | 22.89 | 4.81 | 4.81 | 8.93 | 8.91 | 15.34 | 15.11 | 12.55 | 11.76 |
| 99 | 25.44 | 24.35 | 4.81 | 4.81 | 8.94 | 8.93 | 15.67 | 15.45 | 13.12 | 12.29 |
| 100 | 27.27 | 26.01 | 4.81 | 4.81 | 8.95 | 8.95 | 15.99 | 15.79 | 13.75 | 12.88 |
| 101 | 29.36 | 27.93 | 4.81 | 4.81 | 8.96 | 8.96 | 16.27 | 16.10 | 14.43 | 13.51 |
| 102 | 31.77 | 30.15 | 4.81 | 4.81 | 8.96 | 8.96 | 16.53 | 16.38 | 15.01 | 14.06 |
| 103 | 34.57 | 32.76 | 4.81 | 4.81 | 8.96 | 8.96 | 16.75 | 16.64 | 15.85 | 14.85 |
| 104 | 37.82 | 35.81 | 4.81 | 4.81 | 8.96 | 8.96 | 16.93 | 16.84 | 16.79 | 15.72 |
| 105 | 41.60 | 39.41 | 4.81 | 4.81 | 8.96 | 8.96 | 17.08 | 17.01 | 16.92 | 15.89 |
| 106 | 46.03 | 43.66 | 4.81 | 4.81 | 8.96 | 8.96 | 17.16 | 17.13 | 17.02 | 16.01 |
| 107 | 51.23 | 48.69 | 4.81 | 4.81 | 8.96 | 8.96 | 17.22 | 17.21 | 17.08 | 16.09 |
| 108 | 57.34 | 54.67 | 4.81 | 4.81 | 8.96 | 8.96 | 17.26 | 17.25 | 17.12 | 16.13 |
| 109 | 64.58 | 61.81 | 4.81 | 4.81 | 8.96 | 8.96 | 17.28 | 17.27 | 17.14 | 16.15 |
| 110 | 73.20 | 70.40 | 4.81 | 4.81 | 8.96 | 8.96 | 17.28 | 17.28 | 17.16 | 16.16 |

A019020P

# 14. Income Payment Option Table (continued)

Option 7—Joint and Survivor Monthly Life Income
The amount of income will be based on the ages of the option annuitants on their respective birthdays nearest the date of the first payment. The table shows income for certain ages for one male and one female option annuitant. The amount is shown under the age of the male and opposite the age of the female. Amounts of income for other combinations of ages or for option annuitants of the same sex will be furnished upon request.

| Age of Female Option Annuitant | Age of Male Option Annuitant | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 50 | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 90 | 95 | 100 | 105 | 110 |
| 50 | $2.72 | $2.80 | $2.87 | $2.92 | $2.95 | $2.97 | $2.98 | $2.99 | $3.00 | $3.00 | $3.00 | $3.00 | $3.00 |
| 55 | 2.85 | 2.98 | 3.09 | 3.18 | 3.24 | 3.28 | 3.30 | 3.32 | 3.33 | 3.33 | 3.33 | 3.34 | 3.34 |
| 60 | 2.96 | 3.15 | 3.32 | 3.47 | 3.58 | 3.66 | 3.71 | 3.74 | 3.75 | 3.76 | 3.77 | 3.77 | 3.77 |
| 65 | 3.05 | 3.29 | 3.54 | 3.77 | 3.97 | 4.12 | 4.22 | 4.28 | 4.32 | 4.35 | 4.35 | 4.36 | 4.37 |
| 70 | 3.12 | 3.41 | 3.73 | 4.07 | 4.39 | 4.66 | 4.86 | 5.00 | 5.08 | 5.13 | 5.16 | 5.18 | 5.19 |
| 75 | 3.17 | 3.50 | 3.89 | 4.33 | 4.80 | 5.25 | 5.64 | 5.92 | 6.12 | 6.24 | 6.31 | 6.36 | 6.38 |
| 80 | 3.20 | 3.56 | 4.00 | 4.53 | 5.16 | 5.83 | 6.48 | 7.04 | 7.46 | 7.75 | 7.95 | 8.07 | 8.14 |
| 85 | 3.22 | 3.59 | 4.06 | 4.67 | 5.43 | 6.31 | 7.28 | 8.24 | 9.06 | 9.70 | 10.19 | 10.54 | 10.72 |
| 90 | 3.23 | 3.61 | 4.10 | 4.75 | 5.60 | 6.65 | 7.92 | 9.31 | 10.68 | 11.89 | 12.95 | 13.82 | 14.34 |
| 95 | 3.24 | 3.62 | 4.12 | 4.80 | 5.69 | 6.86 | 8.35 | 10.12 | 12.03 | 13.93 | 15.80 | 17.59 | 18.77 |
| 100 | 3.24 | 3.63 | 4.14 | 4.82 | 5.75 | 7.00 | 8.64 | 10.73 | 13.20 | 15.88 | 18.87 | 22.12 | 24.70 |
| 105 | 3.24 | 3.63 | 4.14 | 4.84 | 5.79 | 7.09 | 8.86 | 11.22 | 14.23 | 17.86 | 22.51 | 28.80 | 35.26 |
| 110 | 3.24 | 3.63 | 4.15 | 4.85 | 5.81 | 7.13 | 8.97 | 11.50 | 14.89 | 19.30 | 25.93 | 36.41 | 52.85 |

A019021P

## Additional Policy Specifications

GUARANTEED MAXIMUM MONTHLY EXPENSE
CHARGE PER $1,000 OF SPECIFIED AMOUNT

| ISSUE AGE | BASE COVERAGE CHARGE |
|-----------|----------------------|
| 78 | .639 |
| 79 | .738 |
| 80 | .837 |
| 81 | .936 |
| 82 | 1.035 |
| 83 | 1.133 |
| 84 | 1.232 |
| 85 | 1.331 |

TABLE OF GUARANTEED MAXIMUM MONTHLY COST OF INSURANCE RATES PER $1,000

| ATTAINED AGE | BASE RATE |
|---|---|
| 78 | $4.41680 |
| 79 | 4.84440 |
| 80 | 5.32260 |
| 81 | 5.97240 |
| 82 | 6.70610 |
| 83 | 7.43790 |
| 84 | 8.24760 |
| 85 | 9.16070 |
| 86 | 9.98990 |
| 87 | 11.23980 |
| 88 | 12.54780 |
| 89 | 13.94480 |
| 90 | 15.23450 |
| 91 | 15.88770 |
| 92 | 17.17440 |
| 93 | 19.08740 |
| 94 | 21.50910 |
| 95 | 24.50900 |
| 96 | 27.36920 |
| 97 | 30.32460 |
| 98 | 30.83220 |
| 99 | 32.53310 |
| 100 | 35.24150 |
| 101 | 38.13950 |
| 102 | 41.38490 |
| 103 | 44.93700 |
| 104 | 48.86670 |
| 105 | 53.13810 |
| 106 | 57.54080 |
| 107 | 62.07690 |
| 108 | 66.66690 |
| 109 | 71.47590 |
| 110 | 76.42520 |
| 111 | 81.21110 |
| 112 | 83.33330 |

POLICY NUMBER    8 214 580
FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE
TERESA MARTINEZ
AGE 78        FEMALE

## Additional Policy Specifications

TABLE OF GUARANTEED MAXIMUM MONTHLY COST OF INSURANCE RATES PER $1,000

| ATTAINED AGE | BASE RATE |
|---|---|
| 113 | $83.33330 |
| 114 | 83.33330 |
| 115 | 83.33330 |
| 116 | 83.33330 |
| 117 | 83.33330 |
| 118 | 83.33330 |
| 119 | 83.33330 |
| 120 | 83.33330 |

POLICY NUMBER    8 214 580
FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE
TERESA MARTINEZ
AGE 78        FEMALE

| POLICY YEAR | MONTHLY NO-LAPSE PREMIUM | ANNUAL TIER 1 VALUE | ANNUAL TIER 2 VALUE |
|---|---|---|---|
| 1 | 8,550.00 | 921,700.00 | 3,425,000.00 |
| 2 | 8,891.15 | 447,200.00 | 3,600,000.00 |
| 3 | 10,406.25 | 447,200.00 | 3,775,000.00 |
| 4 | 12,326.15 | 447,200.00 | 3,950,000.00 |
| 5 | 14,614.40 | 447,200.00 | 4,020,000.00 |
| 6 | 17,207.10 | 1,067,135.00 | 3,986,930.00 |
| 7 | 20,169.85 | 1,067,135.00 | 4,143,750.00 |
| 8 | 23,409.90 | 1,067,135.00 | 4,290,210.00 |
| 9 | 26,861.75 | 1,067,135.00 | 4,419,985.00 |
| 10 | 30,559.45 | 1,067,135.00 | 4,530,375.00 |
| 11 | 34,350.60 | 1,260,165.00 | 4,573,670.00 |
| 12 | 36,767.55 | 1,260,165.00 | 4,626,040.00 |
| 13 | 37,503.80 | 1,260,165.00 | 4,661,095.00 |
| 14 | 38,223.10 | 1,260,165.00 | 4,689,730.00 |
| 15 | 38,894.00 | 1,260,165.00 | 4,712,365.00 |
| 16 | 39,654.90 | 1,403,700.00 | 4,709,755.00 |
| 17 | 40,536.80 | 1,403,700.00 | 4,721,405.00 |
| 18 | 41,446.90 | 1,403,700.00 | 4,726,675.00 |
| 19 | 42,352.70 | 1,403,700.00 | 4,724,930.00 |
| 20 | 43,324.10 | 1,403,700.00 | 4,715,135.00 |
| 21 | 44,298.35 | 1,585,085.00 | 4,660,925.00 |
| 22 | 45,309.45 | 1,585,085.00 | 4,618,370.00 |
| 23· | 46,322.10 | 1,585,085.00 | 4,554,775.00 |
| 24 | 46,576.50 | 1,585,085.00 | 4,462,540.00 |
| 25 | 46,859.45 | 1,585,085.00 | 4,339,885.00 |
| 26 | 47,255.00 | 1,585,085.00 | 4,181,745.00 |
| 27 | 47,822.80 | 1,585,085.00 | 3,994,340.00 |
| 28 | 48,385.20 | 1,585,085.00 | 3,765,425.00 |
| 29 | 48,745.55 | 1,585,085.00 | 3,492,340.00 |
| 30 | 48,922.45 | 1,585,085.00 | 3,175,035.00 |
| 31 | 48,876.00 | 844,575.00 | 2,906,540.00 |
| 32 | 48,741.20 | 844,575.00 | 2,559,745.00 |
| 33 | 48,471.70 | 844,575.00 | 2,263,715.00 |
| 34 | 47,910.70 | 844,575.00 | 2,060,280.00 |
| 35 | 47,131.85 | 844,575.00 | 1,966,540.00 |

POLICY NUMBER    8 214 580
FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE
TERESA MARTINEZ
AGE 78        FEMALE

9599

## Additional Policy Specifications

| POLICY YEAR | MONTHLY NO-LAPSE PREMIUM | ANNUAL TIER 1 VALUE | ANNUAL TIER 2 VALUE |
|---|---|---|---|
| 36 | 46,039.25 | 844,575.00 | 1,981,745.00 |
| 37 | 45,670.70 | 844,575.00 | 2,040,235.00 |
| 38 | 44,968.15 | 844,575.00 | 2,092,985.00 |
| 39 | 44,237.15 | 844,575.00 | 2,167,900.00 |
| 40 | 43,607.35 | 844,575.00 | 2,234,820.00 |
| 41 | 42,694.95 | 737,770.00 | 2,322,635.00 |
| 42 | 41,873.20 | 737,770.00 | 2,357,590.00 |
| 43 | 41,913.05 | 737,770.00 | 2,393,775.00 |

POLICY NUMBER   8 214 580
FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE
TERESA MARTINEZ
AGE 78          FEMALE

# Additional Policy Specifications

Table of Death Benefit Factors

| Attained Age | Factor |
|---|---|
| 0-40 | 2.50 |
| 41 | 2.43 |
| 42 | 2.36 |
| 43 | 2.29 |
| 44 | 2.22 |
| 45 | 2.15 |
| 46 | 2.09 |
| 47 | 2.03 |
| 48 | 1.97 |
| 49 | 1.91 |
| 50 | 1.85 |
| 51 | 1.78 |
| 52 | 1.71 |
| 53 | 1.64 |
| 54 | 1.57 |
| 55 | 1.50 |
| 56 | 1.46 |
| 57 | 1.42 |
| 58 | 1.38 |
| 59 | 1.34 |
| 60 | 1.30 |
| 61 | 1.28 |
| 62 | 1.26 |
| 63 | 1.24 |
| 64 | 1.22 |
| 65 | 1.20 |
| 66 | 1.19 |
| 67 | 1.18 |
| 68 | 1.17 |
| 69 | 1.16 |
| 70 | 1.15 |
| 71 | 1.13 |
| 72 | 1.11 |
| 73 | 1.09 |
| 74 | 1.07 |
| 75-90 | 1.05 |
| 91 | 1.04 |
| 92 | 1.03 |
| 93 | 1.02 |
| 94-120 | 1.01 |

A019431P

# Rider - Accelerated Death Benefit Agreement

The Penn Mutual Life Insurance Company agrees, subject to the provisions of this agreement, to provide prepayment of a portion of the death benefit based on a noncorrectable terminal illness resulting in the Insured's remaining life expectancy to be twelve months or less.

This agreement is a part of the policy to which it is attached. It is subject to all of the provisions of the policy unless stated otherwise in this agreement

**Disclosure -** This agreement provides for an accelerated death benefit to the Insured. The receipt of accelerated death benefits may be taxable. Assistance and advice should be obtained from a personal tax advisor prior to receipt of any such payments. Accelerated death benefit payments may also adversely affect the recipient's eligibility for Medicaid and other government provided benefits. Death benefits, cash values, and loan values will be reduced if an accelerated death benefit is paid.

**Free Look Period -** Within ten days of receipt of the Accelerated Benefit Payment, the Insured may return the payment to the Company. The Company will then void the agreement. Should the ten Day Free Look be exercised, the Insured may not apply for this benefit again at a later date.

**Benefit Payment -** If the Insured dies before accelerated benefits are paid, no payment will be made under this agreement. However, this provision will not apply to any payment made by the Company before receiving written notice of the Insured's death at the Company.

**Premium -** There is no premium for this benefit.

**Values -** This agreement has no cash values or loan values.

**Eligibility -** In order to receive any benefits under this agreement, all the following conditions must be satisfied:

(1) This agreement is only available for coverage on the life of the Primary Insured. Any policies with more than one Primary Insured is ineligible for this benefit unless agreed to by the Company.

(2) The Insured's request for benefits under this agreement must be received in a written form at the Home Office of the Company.

(3) The Company must receive due proof evidence that the Insured has a noncorrectable terminal illness. This includes but not limited to certification from a physician licensed in the United States. This noncorrectable terminal illness must result in the Insured having a remaining life expectancy of twelve months or less. The licensed physician shall not be the Insured, Owner, Beneficiary, or a relative thereof. The Company reserves the right to obtain additional medical opinions provided at the Company's expense. The Company also reserves the right to rely solely on this additional medical opinions for claims purposes should these opinions differ from those of the Insured's physician.

(4) This agreement is attached only to the base policy (excluding any additional riders) of permanent life insurance. The Company reserves the right to exclude certain permanent insurance from eligibility for this agreement.

(5) The permanent life insurance to which this agreement is attached:

    (a) Must have been inforce for more than two years. Any changes in coverage amount, which is subject to a new contestable period, is not eligible for this agreement.
    (b) Must have at least two years remaining from this agreement's effective date until the maturity date of the policy.
    (c) Must be inforce other than as extended term insurance or reduced paid-up insurance.
    (d) Must not be in its premium grace period.

(6) The Company must receive signed acknowledgment of concurrence of payments from all assignees, irrevocable beneficiaries, or other interested parties.

ACDB-03

# Rider - Accelerated Death Benefit Agreement (continued)

(7) This benefit is not available if:

    (a) Law requires this benefit to meet the claims of creditors, whether in bankruptcy or otherwise, or
    (b) A government agency requires this benefit in order to apply for, obtain, or keep a government benefit or entitlement.

**Requested Percentage** - The Requested Percentage is the percentage of Eligible Face Amount that is to be accelerated. The unadjusted payment is the Requested Percentage multiplied by the Eligible Face Amount. The Company reserves the right to limit the unadjusted payment and the accelerated benefit such that:

(1) The Requested Percentage does not exceed 50%;

(2) The sum of all Accelerated Benefit Payments does not exceed $250,000 for all policies inforce with the Company;

(3) The Accelerated Benefit Payment is at least $10,000 for each policy; and

(4) The policy is not disqualified as life insurance according to Internal Revenue Code.

**Eligible Face Amount** - Does not include all coverages, but is restricted to the following in effect on the agreement's effective date:

(1) The base policy face amount (excluding any additional riders); plus

(2) The face amount of any paid-up additions.

**Accelerated Benefit Payment** - This is the actual benefit amount that the insured will receive under this agreement if eligible. The Company will pay the Accelerated Benefit Payment only once per policy. The Accelerated Benefit Payment is equal to the unadjusted payment less the following adjustment as of the benefit payment date:

(1) Charges will be deducted from the unadjusted payment. These charges include a risk charge and an interest rate discount. The maximum interest rate used shall be no greater than the greater of the current yield on the ninety-day treasury bill or the current maximum statutory adjustable policy loan interest rate. These charges will reflect:

    (a) The premature payment of a portion of the policy's death benefit; and
    (b) Premiums and policy charges that would have been due during the twelve month period following the benefit payment date for the coverage corresponding to this unadjusted payment.

(2) Any policy loans will reduce the unadjusted payment by an amount equal to the Requested Percentage times the loan amount.

**Effect on Policy Values** - The policy will be subject to reductions which reflect the Accelerated Benefit Payment. These reductions will be made to the death benefit, cash value, paid-up additions, loan amounts, premium payments, and any other policy charges.

**Effective Date.** The effective date of this agreement is the same as the Date of Issue of this Policy unless another effective date is shown below.

The Penn Mutual Life Insurance Company

*Eileen C. McDonnell*

President

ACDB-03

### PRIVACY POLICY NOTICE
The Penn Mutual Life Insurance Company,
Penn Insurance & Annuity Company and Hornor, Townsend & Kent, Inc.

We are dedicated to providing products and services that help protect you and your family. Just as important to us are the protection of your privacy and the safeguarding of the information that you voluntarily provide to us. We want you to understand what information we collect and how we use it. The following policy serves as our standard for the collection, use and security of your personal information.

**What Information We Collect**

As part of our business, we obtain certain personal information about you in order to provide a financial product or service to you. This information includes information we receive from you on applications or other forms, information about your transactions with us, information provided by insurance-support organizations and information from your visits to our websites. For example, your personal information includes your medical history, financial information and identifying information such as your Social Security number and address. You have the right to access and request correction of recorded information. You may write or call us at (800) 523-0650 to make such a request.

**What Information We Disclose**

We do not disclose nonpublic personal information about our current or former customers to anyone, except as permitted by law. The limited circumstances under which we are permitted by law to disclose a customer's personal information include to the extent necessary to service or process an insurance product or service that you requested or authorized; with your consent or at your direction; to your legal representative; in response to a subpoena; to comply with federal, state or local laws and to protect against fraud. We are also permitted to disclose customer information to companies that perform services for us and with whom we have a non-disclosure agreement. For instance, we have service providers with whom we contract to mail customer statements and to store customer files. Information we obtain from a report prepared by an insurance-support organization may be retained and disclosed by that organization.

**Our Security Procedures**

We collect only relevant information about our customers. We safeguard the personal information of our current and former customers and disclose it only for legitimate business or legal reasons. We provide access to information about you to only those individuals who need to know that information to provide products or service to you, for example, underwriting, customer service and claims processing. All of our employees, agents, and contractors are trained to respect customer privacy and those who violate our privacy policy are subject to discipline. We do not employ, nor provide access to customer information, to any employee, agent, contractor or service provider who has not signed a non-disclosure agreement. We maintain physical, electronic and procedural safeguards that comply with state and federal regulations to guard your personal information.

March 2008

CHECK BOX OF APPLICABLE COMPANY

☒ The Penn Mutual Life Insurance Company
Philadelphia, PA 19172
☐ The Penn Insurance and Annuity Company
Philadelphia, PA 19172

**Application for Life Insurance**

**PART 1**

| A. | PROPOSED INSURED 1 | 1. Name of First Insured (First, Middle, Last) *Teresa Martinez* | | | 2. Sex ☐ Male ☒ Female | 3. Date of Birth |
|---|---|---|---|---|---|---|

| 4. Social Security No. 7012 | 5. Birth Place CA | 6. Citizen of (Country) USA | 7. For Non-US citizen Visa # and Type (attach copy) |
|---|---|---|---|

| 8. Residence: Street | City Santa Maria, CA | State CA | Zip 93458 |
|---|---|---|---|

| 9. Years at this Address 15+ | 10. Marital Status ☒ M ☐ D ☐ S ☐ W | 11. Home Phone No. (805) 928-5131 | 12. Drivers License State and No. CA |
|---|---|---|---|

13. Occupation (include duties) *Semi-retired - Charitable fund raiser - organizer*

| 14. Employer *Self* | 15. How Long 20+ | 16. Area Code and Business Phone No. ( ) |
|---|---|---|

| 17. Street *Same* | City | State | Zip |
|---|---|---|---|

| B. | PROPOSED INSURED 2 | 1. Name of Second Insured (First, Middle, Last) | | | 2. Sex ☐ Male ☐ Female | 3. Date of Birth Month Day Year |
|---|---|---|---|---|---|---|

Complete for

☐ Survivorship
☐ Additional Insured Rider

For Children's Rider, complete form PM5023

If info for PI 1 is same as PI 2 indicate same.

| 4. Social Security No. | 5. Birth Place | 6. Citizen of (Country) | 7. For Non-US citizen Visa # and Type (attach copy) |
|---|---|---|---|

| 8. Residence: Street | City | State | Zip |
|---|---|---|---|

| 9. Years at this Address | 10. Marital Status ☐ M ☐ D ☐ S ☐ W | 11. Home Phone No. ( ) | 12. Drivers License State and No. |
|---|---|---|---|

| 13. Relationship to First Insured | 14. Occupation (include duties) |
|---|---|

| 15. Employer | 16. How Long | 17. Area Code and Business Phone No. ( ) |
|---|---|---|

| 18. Street | City | State | Zip |
|---|---|---|---|

| C. | PLAN OF INSURANCE | 1. Plan Name *Protection for Life UL* | 2. Term Rider Name |
|---|---|---|---|

| DEATH BENEFIT | 3. Face Amt. (Base Only) $ 4,000,000 | 4. Face Amt. (Term Portion) $ — | 5. Total Initial Coverage $ 4,000,000 |
|---|---|---|---|

| DEATH BENEFIT OPTION (UL and VUL only) | 6. Check One | ☒ Level Death Benefit | ☐ Increasing Death Benefit |
|---|---|---|---|

| PREMIUM TEST (UL and VUL only) | 7. Check One | ☒ Guideline Premium | ☐ Cash Value |
|---|---|---|---|

| D. | ADDITIONAL BENEFITS AND RIDERS | 1. Universal Life Plans | 2. Traditional / Term Plans |
|---|---|---|---|

**1. Universal Life Plans**

☐ Disability Waiver of Monthly Deductions
☐ Disability Completion Benefit and Disability Waiver of Monthly Deductions
☐ Accidental Death Benefit $ _____
☐ Guaranteed Increase Option $ _____
☐ Guaranteed Continuation of Policy
☐ Extended No Lapse Guarantee
☐ Option to Extend Maturity Rider
☐ Other _____

**2. Traditional / Term Plans**

☐ Guaranteed Premium Benefit
☐ Option to Purchase Add'l Ins. $ _____
☐ Accidental Death Benefit $ _____
☐ Term Waiver of Premium (choose below)
  ☐ Option A    ☐ Option B
☐ Whole Life Waiver of Premium
☐ Other _____
☐ Other _____
Automatic Premium Loan ☐ Yes ☐ No

| E. DIVIDEND OPTIONS | Universal Life | Traditional Plans | |
|---|---|---|---|
| | ☐ Cash<br>☑ Credited to Cash Value | ☐ Cash<br>☐ Paid-up Additions<br>☐ Premium Reduction<br>(Not available with Penn Check or Salary Allotment) | ☐ Accumulate at Interest<br>☐ Other_____ |

**F. PREMIUM**

1. Was Money collected with the Application?

☐ Yes    ☑ No    Amount $ _____      Number of Months (UL only) _____

(If "Yes" submit Temporary Insurance Agreement)

2. Billing Method

☑ Regular

☐ Penn Check    add to existing account no. _____

☐ Salary Allotment    add to existing account no. _____

Billing Mode    ☐ Single   ☑ Annual   ☐ Semi-annual   ☐ Quarterly   ☐ Monthly (Penn Check and Salary Allotment only)

Billing Premium _222, 800_

Initial Additional Premium Deposit _25_    ☐ 1035X   ☐ Other

3. ADPUA    ☐ Yes   ☐ No    If Yes,    Lump Sum _____    Scheduled Amt. _____

4. Will any part of the premium be paid from funds that are borrowed or otherwise financed?    ☐ Yes   ☑ No

If "Yes" details _____

_____

_____

**G. PENN CHECK ACCOUNT INFORMATION**

*Complete only if Penn Check mode is selected and this is a new account. Also attach a Void Check*

| 1. Bank Name | 2. Bank Routing and Account No. | | | |
|---|---|---|---|---|
| 3. Account Type | | | | 4. Draw Date: |
| ☐ Checking   ☐ Savings   ☐ Pershing   ☐ Other | | | | ☐ 1st   ☐ 8th   ☐ 15th   ☐ 22nd |
| 5. Bank Address (Street, City, County, State, Zip) | | | | |
| 6. Name (First, Middle, Last) of First Depositor | | 7. Name (First, Middle, Last) of Second Depositor | | |

**H. OWNER**

*1-9: Complete only if Owner is other than Proposed Insured 1. If Trust, give name of Trust, Trustee and date of Trust*

*10-12: Complete requested information.*

*Note: If Owner is a Trust or Insured's business __omit__ questions 4, 9, 10, 11, 12.*

| 1. Name(s) (First, Middle, Last) of Owner(s) or Complete Name of Entity | | 2. Relationship to Proposed Insured |
|---|---|---|
| Charter Oak Trust | | Trust |
| 3. Address (Street, City, County, State, Zip) | | |
| 100 Grist Mill Rd, Simsbury CT 06070 | | |
| 4. Date of Birth | 5. Soc. Sec. # / Tax ID | 6. Telephone # | 7. Name of Trustee |
| | 5830 | (860) 408-7000 | Wayne H. Bursey |
| 8. Date of Trust | 9. Occupation | | |
| 10/1/2006 | — | | |
| 10. Household Net Income | 11. Tax Bracket | 12. Liquid Net Worth (Exclude Primary Residence) | |
| — | —   . % | — | |

## I. SUITABILITY

*This section must be completed for the Owner and is to be completed for all business as stated below.*

*For HTK Producers: Complete this section for all Traditional Life Plans. For Variable Life Plans, complete the HTK Account Agreement in lieu of this section.*

*For Non-HTK Producers: This section must be completed for both Traditional Plans as well as Variable Life Plans.*

### 1. Prior Investment Experience (check one only)

☐ None - No investment experience. Previous holdings were generally limited to bank savings accounts and CD's

☐ Average - Invests in securities on an infrequent basis. Has 1-2 years experience investing in securities. Has a general knowledge of the risks and rewards of investing in securities.

☑ Above Average - Invests in securities on a frequent basis. Has a number of years experience investing in securities. Has a general knowledge of the risks and rewards of investing in securities.

☐ Active - Invests in securities on a frequent basis. Has a number of years experience investing in securities. Has extensive knowledge of the risks and rewards of investing in securities.

### 2. Primary Source of Funds (for this transaction, check one only)

☐ Current Income
☐ Gift/Inheritance
☐ Proceeds from sale of mutual funds
☐ Savings
☑ Other _Trust Assets_

☐ Rollover from pension/retirement fund
☐ Proceeds from sale of stocks or bonds
☐ Policy Values from existing life/annuity contract
☐ Surrender of life insurance/annuity contract
☐ Personal Loan

### 3. Financial Needs/Benefits (check all that apply)

☑ Death Benefit/Enhanced Death Benefit
☐ Asset Rebalancing
☐ Retirement Funding
☑ Estate Planning
☐ Tax Deferral/Tax Advantage
☐ Debt Protection
☐ Charitable Giving

☐ Savings, Accumulation
☐ Diversification of Investments
☐ Education/College Funding
☐ Business Purposes
☐ Annuitization Options
☐ Current Income
☐ Other _____

### 4. Risk Profile (Variable Life only, check one only)

☐ Conservative-Accepts a low return potential. Maintain a low degree of risk

☐ Moderate-Accepts fair degree of risk including lack of liquidity, in order to pursue the potential for a modest return

☐ Aggressive-Accepts high degree of risk, including a limited loss of principal, in order to pursue the potential for a higher return

☐ Very Aggressive-Accepts maximum degree of risk, including total loss of principal, in order to pursue the maximum possible return

### 5. Primary Investment Objective (Variable Life only, check one only)

☐ Safety of Principal –Preservation of Investment Principal

☐ Income-Regular, current income stream. May need investment principal within next five years.

☐ Growth and Income-Moderate growth. Current Income Stream. May need investment principal within next five years

☐ Growth-Grow assets moderately or slightly above rate of inflation. Will not need investment principal for at least ten years

☐ Aggressive Growth-Desire to grow assets substantially. Will not need investment principal for at least ten years. Reinvestment of income

☐ Speculation-Grow assets substantially in short time frame. Higher than average possibility of total loss of principal. Will not need investment principal for at least ten years

| **J. PAYOR** | 1. Name(s) (First, Middle, Last) of Payor(s) | | 2. Relationship to Proposed Insured |
|---|---|---|---|
| Complete only if Payor is other than the Proposed Insured or Owner or if a different address is requested. If Payor is a trust or Insured's business, omit questions 5, 6 and 7. | _Charter Oak Trust_ | | |
| | 3. Address: (Street, City, State, Zip)   _Same As owner_ | | |
| | 4. Mailing Address (if different from above): (Street, City, State, Zip) | | |
| | 5. Occupation | 6. Annual earned income from occupation | |
| | 7. Other Income & Source | | 8. Soc. Sec # or Tax ID # |

| **K. PRIMARY BENEFICIARY** | 1. Name of Primary Beneficiary(ies). (If Trust, give Name, Date of Trust and Name of Trustee) |
|---|---|
| Note: If no beneficiary survives the insured, proceeds revert to the Estate of the Insured. | _Charter Oak Trust_ , _Wayne H. Bursey, Trustee_ |
| | _100 Grist Mill Rd,_ |
| | _Simsbury, CT 06070_ |

| 2. Relationship to Proposed Insured | 3. Soc. Sec # or Tax ID # |
|---|---|
| _Trust_ | ▓▓▓ _-5830_ |

| **L. CONTINGENT BENEFICIARY** | 1. Name of Contingent Beneficiary |
|---|---|
| | 2. Relationship to Proposed Insured | 3. Soc. Sec # or Tax ID # |

| **M. RIDER BENEFICIARY** | 1. Name of Rider Beneficiary |
|---|---|
| If no beneficiary is named or survives Insured, proceeds revert to the owner. | 2. Relationship to Proposed Insured | 3. Soc. Sec # or Tax ID # |

**N. LIFE INSURANCE IN FORCE OR PENDING**

| | Proposed Insured 1 | Proposed Insured 2 |
|---|---|---|
| 1. Have you ever applied for life, health or disability insurance and been declined, postponed or charged an increased premium? | ☐YES ☑NO | ☐YES ☐NO |
| 2. Do you have any applications pending with any other life insurance company now? | ☐YES ☑NO | ☐YES ☐NO |
| 3. Have you been involved in any discussion about the possible sale or assignment of this policy to a Life Settlement, Viatical or other secondary market provider? | ☐YES ☑NO | ☐YES ☐NO |
| 4. Have you in the past 2 years sold a policy to a Life Settlement, Viatical or other secondary market provider? | ☐YES ☑NO | ☐YES ☐NO |

If answered "Yes" to above questions, please give details for each Proposed Insured.

Proposed Insured 1 _____

_____

Proposed Insured 2 _____

## N. LIFE INSURANCE IN FORCE OR PENDING (continued)

5. List all insurance in Force on any Proposed Insured. If none, check this box. ☐

| Insured's Name & Company | Face Amount | Policy Number | Issue Year | Is this Policy being Replaced or Changed? | Check if 1035 Exchange |
|---|---|---|---|---|---|
| | | | | ☐ Yes ☐ No | |
| | | | | ☐ Yes ☐ No | |
| | | | | ☐ Yes ☐ No | |
| | | | | ☐ Yes ☐ No | |
| | | | | ☐ Yes ☐ No | |

## O. REPLACEMENT AND 1035 EXCHANGE INFORMATION

1. a) Are you considering stopping premium payments, surrendering, replacing, forfeiting, assigning to the insurer or reducing your benefits under an existing policy or contract?　☐ YES ☑ NO

b) Are you considering using or borrowing funds from your existing policies or contracts to pay premiums due on the new or applied for policy?　☐ YES ☑ NO

If answered "Yes" to either question, please complete and sign all required replacement forms.

2. If 1035 Exchange, will loan be carried over?　☐ YES ☑ NO　If Yes, amount　$ _N/A_

Details _____

## P. TOBACCO AND/OR NICOTINE USE

1. Has any person proposed for coverage ever used tobacco or nicotine products in any form?

PI1 ☐ Yes ☑ No　　PI2 ☐ Yes ☐ No

2. If "Yes":　PI1　Type _____　Frequency _____　Date Last Used _____
　　　　　　PI2　Type _____　Frequency _____　Date Last Used _____

## Q. PERSONAL INFORMATION

*Complete for all Proposed Insureds*

*Provide details to any yes answers in the "Details" section*

| | PI1 | PI2 |
|---|---|---|
| 1. Annual earned income from occupation (After deduction of business expenses) | $ 21,000 | $ |
| 2. Other Income (State source in "Details") | $ 300,000 | $ |
| 3. Net Worth | $ 7,400,000 | |

4. Has any Proposed Insured declared bankruptcy? (If "Yes" has it been discharged and date of discharge)

Declared Bankruptcy　YES ☐　NO ☑　　Discharged　YES ☐　NO ☐　　Date of Discharge _____

Details 1) _Soc. Sec._
2) _Interest income, dividends & cap gain from trust assets_

## Q. PERSONAL INFORMATION (Continued)

*Complete for all Proposed Insureds.*

*Provide details to any yes answers in "Details" Section*

| | | PI 1 | | PI 2 | |
|---|---|:---:|:---:|:---:|:---:|
| | | YES | NO | YES | NO |
| 5. | Does any Proposed Insured intend to reside or travel outside the United States within the next 24 months? (If "Yes" complete foreign travel questionnaire) | | | ☐ | ☐ |
| 6. | Is any Proposed Insured a member, or intending to become a member, of any armed forces or military reserve? | | | ☐ | ☐ |
| 7. | Within the past three years, has any Proposed Insured: | | | | |
| | (a) Flown or taken instruction as a pilot or crew member or intend to do so? (If "Yes", complete Aviation Supplement) | | | ☐ | ☐ |
| | (b) Engaged in any kind of racing, scuba or sky diving, hang gliding, rock climbing, or other hazardous avocation or intend to do so? (If "Yes", complete appropriate questionnaire) | | | ☐ | ☐ |
| | (c) Been convicted of a moving violation or had their driver's license suspended or revoked? | | | ☐ | ☐ |
| 8. | Has any Proposed Insured ever: | | | | |
| | (a) Used amphetamines, barbiturates, hallucinogens, marijuana, cocaine, narcotics, or other controlled substances, except as prescribed by a physician? | | | ☐ | ☐ |
| | (b) Been counseled or treated for use of alcohol or drugs? | | | ☐ | ☐ |
| 9. | Within the past ten years, has any Proposed Insured been convicted of a felony? | | | ☐ | ☐ |
| 10. | Is there any family history of cancer, diabetes, heart disease, Huntington Chorea, neuromuscular disorder before the age of 60? | | | ☐ | ☐ |

Details_____

_____

_____

_____

_____

## R. PERSONAL PHYSICIAN

Name and address of Personal Physician(s): GIVE DATE AND REASON LAST CONSULTED. (If no personal physician, list physician last consulted, date and reason last consulted)

**S. MEDICAL HISTORY**

*Complete for all Proposed Insureds.*

*Provide details to any yes answers in "Details" Section*

| | Proposed Insured 1 | Proposed Insured 2 | |
|---|---|---|---|
| 1. Height (in shoes) | | ft. | in. |
| 2. Weight (clothed) | | | lbs. |
| 3. Weight change in last year? | | Yes____ No____ | |
| If "Yes": | | No. of lbs. Reason: | |
| 4. Birth weight if under 6 mo. old | | | lbs. |

| | PI1 | | PI2 | |
|---|---|---|---|---|
| | YES | NO | YES | NO |
| 5. Are you presently taking medication either prescribed or over the counter? If yes, provide full details including name, dosage, and prescribing physician. (if applicable) | | | ☐ | ☐ |
| 6. Within the past five years, has any Proposed Insured: | | | | |
| (a) Consulted a physician for any reason, had an electrocardiogram or other diagnostic tests, not including HIV test? | | | ☐ | ☐ |
| (b) Been in a clinic, hospital or medical facility for observation or treatment? | | | ☐ | ☐ |
| (c) Been advised to have any diagnostic test, hospitalization or surgery which was not done? | | | ☐ | ☐ |
| 7. Has any Proposed Insured ever been treated for, or been diagnosed with: | | | | |
| (a) Chest pain, high blood pressure, stroke, heart murmur, or other circulatory disorder? | | | ☐ | ☐ |
| (b) Cancer, cyst, growth, tumor? | | | ☐ | ☐ |
| (c) Anxiety, depression, dizziness, convulsions, epilepsy or any mental or nervous disorder? | | | ☐ | ☐ |
| (d) Diabetes, thyroid or other glandular disease? | | | ☐ | ☐ |
| (e) Colitis, or any liver or gastrointestinal disorder? | | | ☐ | ☐ |
| (f) Breast, prostate or reproductive disorder? | | | ☐ | ☐ |
| (g) Kidney, bladder or other genitourinary disorder? | | | ☐ | ☐ |
| (h) Asthma, emphysema, chronic obstructive pulmonary disease (C.O.P.D.) or other respiratory disorder? | | | ☐ | ☐ |
| (i) An immune deficiency disorder, Acquired Immune Deficiency Syndrome (AIDS) or Aids Related Complex (ARC)? | | | ☐ | ☐ |

**T. DETAILS FOR MEDICAL HISTORY QUESTIONS**

| Question No. and Letter | Person | Date | Details (include full names and address of physicians, hospitals, etc. |
|---|---|---|---|
| | | | |

| U. FAMILY HISTORY | 1. Proposed Insured 1 | Age if Living | State of Health | Amount of Insurance * | Age at Death | Cause of Death |
|---|---|---|---|---|---|---|
| * Complete amount of insurance only if Primary Insured is under age 17. | Father | | | | 60 √ | Pnemonia |
| | Mother | | | | 79 | Old Age |
| | Brothers and Sisters No. Living____ 4 | | | | | |
| | No. Dead____ | | | | | |

| | 1. Proposed Insured 2 | Age if Living | State of Health | Amount of Insurance * | Age at Death | Cause of Death |
|---|---|---|---|---|---|---|
| | Father | | | | | |
| | Mother | | | | | |
| | Brothers and Sisters No. Living____ 4 | | | | | |
| | No. Dead____ | | | | | |

**CERTIFICATION OF OWNER'S TAXPAYER ID #**

Under penalty of perjury, I the owner certify that:
1. The number shown in this application as my social security number or taxpayer identification number is correct; and
2. I am not subject to backup withholding because I have not been notified by the IRS that I am subject to backup withholding as a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding, or I am exempt from backup withholding.
3. I am a U.S. person (including a U.S. resident alien)
   ☐ Check this box if you are subject to backup withholding under section 3406(a)(1)(c) of the Internal Revenue Code.

**SPECIAL INSTRUCTIONS**

**NON-CONFORMING ILLUSTRATION ACKNOWLEDGEMENT (NON-VARIABLE ONLY)**

I acknowledge that the life insurance policy illustration shown to me differs from the policy application I have completed. I understand that if a policy is issued, an illustration conforming to the policy, as issued, will be provided to me for my signature no later than at the time the policy is delivered.
☑ check if applicable

**AUTHORIZATION FOR FUND TRANSFER (VARIABLE ONLY)**

The agent/registered representative may request transfers of account values pursuant to my instruction unless I check this box.
☐ check if applicable

**PENN CHECK AUTHORIZATION**

By completing Section G of this application, I authorize monthly payments from my checking account, or from my Pershing Resource Checking or Pro Cash Plus account to the Penn Mutual Life Insurance Company, its subsidiaries, affiliates, third party administrators and reinsurers (herein Company) for premiums on this policy, beginning with the next periodic payment that comes due under the contract, until such time as a payment cannot be made due to insufficient funds or the Company gives the other parties at least 30 days' advance written notice of the termination of such payment plan. I am able to cancel the payment plan at any time by either calling the Company at 1-800-523-0650 or in writing. Monthly payments will be drawn from my account on or about the date specified in this application.

I further agree that if any such check be dishonored, whether with or without cause and whether intentionally or inadvertently, the Company shall be under no liability whatsoever even though such dishonor results in the forfeiture of insurance.



| **REPRESENTATIONS** | I(we), the Proposed Insured(s), or Applicant(s) if Proposed Insured(s) is(are) age 17 or less, represent that the state-ments and answers in this part I of the application are written as made by me(us) and are complete and true to the best of my (our) knowledge and belief. I(we) the Proposed Insured(s), or the Applicant(s) if other than the Proposed Insured(s) agree that they will be a part of the contract of insurance if issued; that I(we) will be bound by such state-ments and answers, and that the Company, believing them to betrue, will rely and act upon them, I(we) also understand and agree that: |
|---|---|

1. Subject to the provisions of the temporary insurance agreement attached to this application, no insurance will be in force until the first premium is paid in full and the policy is delivered while the health, habits, occupation and other facts relating to the Proposed Insured(s) and to the Payor, if a Payor Benefit is issued, are the same as described in this Part I of the application, any Part II required by the Company and any amendments or supplements to them.
2. Notice to or knowledge of an agent or a medical examiner is not notice to or knowledge of the Company, and no agent or medical examiner is authorized to accept risks, to pass upon acceptability for insurance or to modify any contract of insurance.
3. Acceptance of any policy issued based on this application will be a ratification of any amendments or corrections noted by the Company in the space headed "Home Office Amendments and Corrections", except that if required by state statute or regulation, any change in amount, age, plan of insurance, additional benefits or classification must be agreed to in writing.

| **FRAUD WARNING**<br>*Applies to all states*<br>*except those*<br>*specifically listed.* | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or a statement of claim containing any materially false information or conceals for the purpose of misleading information concerning any fact material thereto commits a fraudulent insurance act which is a crime and subjects such person to criminal and civil penalties. |
|---|---|

**Colorado:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, and denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

**District of Columbia:** WARNING It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Florida:** Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony in the third degree.

**Kentucky:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals for the purpose of misleading information concerning any fact material thereto commits a fraudulent insurance act which is a crime.

**Louisiana:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Maine & Tennessee:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purposes of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**New Jersey:** Any person who includes false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**New Mexico:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**Ohio:** Any person who, with the intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Oklahoma:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Oregon:** Any person who knowingly and with intent to defraud any insurance company or other person, files an application for insurance or a statement of claim containing any materially false information or conceals for the propose of misleading information concerning any fact material may be guilty of a fraudulent insurance act which is a crime and may subject such person to criminal and civil penalties.

**Pennsylvania:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Virginia:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submit an application or files a claim containing a false or deceptive statement may have violated state law.

**Vermont:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may be proven guilty or fraud.

**Washington:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or knowingly makes a false statement in an application for insurance may be guilty of a criminal offense under state law.

**AUTHORIZATION**

*Write in names of all Proposed Insureds.*

I(we),_____
hereby authorize: (a) any physician, health care provider, health plan, medical professional, hospital, clinic, laboratory, pharmacy or other medical or health care facility that has provided payment, treatment or services to me(us) or on my(our) behalf; (b) any insurance company; and, (c) the Medical Information Bureau, Inc. (MIB), to disclose my(our) entire medical record and any other protected health information concerning me(us) to the Underwriting Department of The Penn Mutual Life Insurance Company, its subsidiaries, affiliates, third party administrators and reinsurers (herein Company).

I(we) understand that such information may include records relating to my(our) physical or mental condition such as diagnostic tests, physical examination notes, and treatment histories, which may include information regarding the diagnosis and treatment of human immunodeficiency virus (HIV) infection, sexually transmitted diseases, and mental illness, and the use of alcohol, drugs and tobacco, but shall not include psychotherapy notes.

I(we) acknowledge that any agreements I(we) have made to restrict my(our) protected health information do not apply to the Authorization, and I(we) instruct any physician, health care professional, hospital, clinic, medical facility or other health care provider to release and disclose my(our) entire medical record without restriction.

I(we) understand that this information will be used by the Company to determine eligibility for insurance.

I(we) hereby authorize the Company to disclose any information it obtains about me(us) to the Medical Information Bureau, Inc., or any other life insurance company with which I(we) do business. I understand that the Company will not disclose information it obtains about me(us) except as authorized by this Authorization, as may be required or permitted by law, or as I(we) may further authorize. I(we) understand that if information is redisclosed as permitted by this Authorization, it may no longer be protected by applicable federal privacy law.

I(we) understand that: (a) this Authorization shall be valid for 24 months from the date I(we) sign it; (b) I(we) may revoke it at any time by providing written notice to the Underwriting Department of the Company subject to the rights of any person who acted in reliance on it prior to receiving notice of its revocation; and (c) my(our) authorized representative and I(we) are entitled to receive a copy of the Authorization upon request and (d) a copy of this Authorization shall be as valid as the original.

I(we) acknowledge receiving an MIB, Inc. Notice, a Fair Credit Reporting Act Notice and a Notice of Information Practices and authorize Penn Mutual to obtain an investigative or other consumer report as described in the Fair Credit Reporting Act Notice.

**SIGNATURES**

Signed and Dated by the Applicant in:

_Santa Maria, CA_     _CA_     _5/23/08_
City                  State          Month/Day/Year

SIGNATURE OF INSURED / OR PARENT IF INSURED IS UNDER THE AGE OF 15

X _Lrisa Martinez_        X_____
Proposed Insured 1              Proposed Insured 2

SIGNATURE OF OWNER AND/OR APPLICANT IF OTHER THAN THE PROPOSED INSURED

X _Warren H. Sussman_      X_____
Owner*                    Applicant

*If a Corporation, the signature and title of any authorized officer other than the Proposed Insured(s) is required and the full name of the corporation must be shown. If a Trust, the signature of the Trustee.

SIGNATURE OF PAYOR

X_____
Payor

**AGENTS CERTIFICATION**

*Be sure to check appropriate block.*

*Each agent present at solicitation must sign.*

I certify to the best of my knowledge the answers to the questions in all parts of this application are true and correct. I further certify to the best of my knowledge this policy ☐ will ☐ will not replace or change any existing life insurance or annuity policy now in force.

X _____
Agent

X _____
Agent

X _____
Agent

X _____
Agent

X _____
Agent

X _____
Agent

**HOME OFFICE AMENDMENTS AND CORRECTIONS**

*Not applicable in Pennsylvania.*

## The Penn Mutual Life Insurance Company
## Philadelphia, PA 19172

**Agent's Underwriting Report**

| A. KNOWLEDGE OF PROPOSED INSURED AND SALE | 1. How long and how well have you known the Proposed Insured? _As applicant_ |
|---|---|

2. Are you aware of any additional factors which might influence insurability? ☐ Yes ☑ No
   If "Yes" give details _N/a_

3. If application taken on a non-medical basis: _N/a_
   a) Were answers from Proposed Insured obtained personally and in your presence? ☐ Yes ☐ No
   b) If the Proposed Insured is a child, did you see the child? ☐ Yes ☐ No

4. What is the specific need for this coverage? _Estate tax liquidity_

5. Will any part of the premium for this policy be paid for by funds that are borrowed or otherwise financed? ☐ Yes ☑ No

6. Have you had any discussions about, or do you have any reason to believe that this policy may be sold or assigned to a Life Settlement, Viatical or other secondary market provider? ☐ Yes ☑ No
   If the answer to either question 5 or 6 is "Yes", provide full and complete details _____

| B. TRUST OR PENSION PLAN DATA | 1. If the policy is being applied for under a Trust or Pension Plan: |
|---|---|

   a) Full name of Trust/Plan _Charter Oak Trust_
   b) Type of Plan
      ☐ Qualified Pension or Profit Sharing Plan
      ☐ Non-Qualified Pension or Profit Sharing Plan
      ☑ Other _Welfare Benefit Plan_

2 JUL '08 AM11:20

2. To comply with IRS regulations, an Agent's Disclosure Form must be submitted once for each qualified plan unless it is three years from the date of the last Disclosure or there has been a change in the plan; i.e., a different product purchased or a change in the commission rate. _N/a_
   a) Disclosure Form has been submitted in the last three (3) years that covers the Commission Schedule applicable to this Contract. ☐ Yes ☐ No
   b) Disclosure Form is attached for this contract. ☐ Yes ☐ No

| C. SUITABILITY AND COMPLIANCE | 1. Have the Fair Credit Reporting Act and MIB, Inc. Notices been given to the Proposed Insured or Applicant if Proposed Insured is a child? ☑ Yes ☐ No |
|---|---|

2. I have complied with all state licensing and educational requirements. ☑ Yes ☐ No

3. I have complied with all required Commission Disclosures. ☑ Yes ☐ No

4. If a replacement is involved, all producers associated with this sale certify that replacement is in the best interests of the Proposed Insured. _N/a_ ☐ Yes ☐ No

| D. VERIFICATION OF IDENTITY | |
|---|---|

**OWNER**
Driver's License ☑  Passport ☐  Birth Certificate ☐
Other Government Issued ID ☐

ID Number _____0599
Issuing Authority _CT_
Issue Date: _8.5.04_
Expiration Date: _8.13.08_

**JOINT OWNER**
Driver's License ☐  Passport ☐  Birth Certificate ☐
Other Government Issued ID ☐

ID Number _____
Issuing Authority _____
Issue Date: _____
Expiration Date: _____

Review ID and verify that the photograph on the ID is the individual. Record ID information above. If individual does not have a Driver's License, Passport, or unexpired Government issued photo ID, secure a copy of the individual's birth certificate. ID information must be obtained for ALL owners. For entities (trusts, corporations, partnerships) secure the appropriate documentation (Certification of Trust, Articles of Incorporation, Corporate Resolution, Partnership Agreement)
ADDITIONALLY FOR ENTITIES AND TRUSTS AND PARTNERSHIPS: Please obtain ID for each Owner, Trustee, or Partner

| E. ASSET BASED COMPENSATION | For Variable Life only, do you want Asset Based Compensation?　Yes ☐　No ☐ |
|---|---|

| F. NEW BUSINESS MARKETING INFORMATION | If you used elements of any of these marketing programs or tools to support your sale please check all that apply. |
|---|---|

☑ Penn Mutual Marketing Brochures
☐ BBP – The Business Building Partners Program
☐ BOSS - Business Owner Success Strategies Small
☐ Business, Big Mistakes
☐ Seminar Marketing
☐ Women's Niche Marketing Program
☐ The Healthcare Niche Marketing Program
☑ Referral Marketing
☐ Email Concepts
☐ Newsletters
☐ Trade Shows

Please check the sales support services and sales concepts used to acquire the sale:

**Sales Support Services Used**

☐ Marketing Consultation
☐ Advanced Sales Support
☑ Product Sales Support (Life or Annuity)

**Sales Concepts**

☑ Protection (Death Benefit)
☐ Wealth Accumulation (Protection PLUS, Wealth Transfer)
☐ Retirement Planning (Retirement Distribution, Stretch IRA)
☐ Estate Planning (Charitable Giving, Survivorship Life)
☐ Business Continuation (PASS, PASS Plus)
☐ Selective Employee Benefits (Deferred Comp, Split Dollar, Executive Bonus, 419 Plans)

| G. SIGNATORY SECTION  Each agent on case must sign. | SOLICITING AGENT _J. Edward Waesche_ | DATE (mm/dd/yyyy) _5/22/0 8_ |
|---|---|---|
| | SOLICITING AGENT | DATE (mm/dd/yyyy) |
| | SOLICITING AGENT | DATE (mm/dd/yyyy) |
| | SOLICITING AGENT | DATE (mm/dd/yyyy) |
| | SOLICITING AGENT | DATE (mm/dd/yyyy) |
| | SOLICITING AGENT | DATE (mm/dd/yyyy) |

| H. AGENT INFORMATION | AGENT'S NAME | PML OFFICE CODE (3 DIGIT) | PML AGENT CODE (5 DIGIT) | % OF COMMISSION |
|---|---|---|---|---|
| | _J Edward Waesche_ | M67 | 53408 | 100 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

To obtain any of the benefits under this policy, write to the Company at its Home Office or to its nearest agent.

Please notify the Company promptly of any change in address.

**Annual Election** - Penn Mutual is a mutual life insurance company. It has no stockholders. The Owner of this policy is a member of Penn Mutual while this policy is in force during the life of the Insured and before surrender of this policy. Members have the right to vote in person or by proxy at the annual election of Trustees held at the Home Office, on the first Tuesday of March. If more information is desired, it may be obtained from the Secretary.



Death Benefit payable at death prior to
Maturity Date
Maturity Benefit Payable at Maturity Date
Flexible premiums payable until Maturity Date
Participating
Supplemental benefits, if any, listed on
Page 3

The Penn Mutual Life Insurance Company, Philadelphia, Pennsylvania 19172
FL-06(S)

# EXHIBIT B

# Memorandum

To:      The Penn Mutual Life Insurance Company

CC:      Jenny Valedaserra

From:   J. Edward Waesche IV

Date:   6/18/2008

Re:      Teresa Martinez

---

Enclosed please find the following for the above referenced Charter Oak client:

- The Penn Mutual Life Insurance Company
    - Application for Life Insurance
    - HIPPA Authorization
    - Notice of AIDS (HIV) Consent
    - Agent's Underwriting Report
    - Financial Products Disclosure Form
    - Acknowledgement and Indemnification Form
- Estate Tax Analysis
- CPA Financials
- Sold Illustration
- Med Exam and Lab Ticket, w/EKG
    - Senior Supplement Questionnaire
- APS; Central Coast Family Care
- APS; Med File Part I
- APS, Med File Part II

The purpose of this letter is to articulate, in detail, the need for insurance on the life of Teresa Martinez. I have included as asset valuation statement by her (CCO and CPA) as well as estate wealth projections and potential estate tax projections.

Teresa Martinez is 77 years old and presents a health profile enabling her advisory team to recommend, underwrite and complete this important insurance planning. Teresa is married to Ignasio Martinez, who is 81 years old, with 4 children and 5 grandchildren. Teresa is retired and plans to continue to enjoy her retirement and actively manage her wealth portfolio for as long as she can.

Teresa wedded early in life, as was the custom in that era. Teresa was a homemaker for the first years of her marriage and made sure her children had a good foundation. Teresa was then very active in the building of home with the income from her husband's job with the Corp. of Army Engineers. They did so well at this combination that Teresa's husband was able to retire at 55! Teresa and her husband were able to move to their current home where they have enjoyed starting organizations (local chapters) a few of which include Meals on Wheels, Salvation Army and Santa Maria Senior's Club.

Teresa is a very active senior walking 2 to 3 times a week in addition to water aerobics and swimming 4 to 5 days a week, more in the summer. Teresa loves to work in her garden as well as fixing up their home.

At present, Teresa's net worth is approximately $7,400,000. Teresa is actively managing the acquisition and sale of all her investments. Her estate is made up of Cash, Real Estate Holdings, Stocks and Corporate Bonds.

Teresa's investments have earned a conservatively average return of about 6% annually. As a result of this growth, Teresa has great concern about the fact that she has no life insurance strategy in place to help offset the tax liability at her death. Coupled by the fact, that Teresa's estate continues to grow due to the success of her asset appreciation.

Teresa is very concerned about the risk of maintaining the value of her assets at the time of her death. The insurance policy will provide for financial security and prevent the liquidation of her business investments, that Teresa wishes to pass along to her heirs. Teresa has a strong desire to pass along the full value of her estate that she has amassed in her lifetime. This estate will go to her loved ones without the reduction due to estate taxes.

Teresa has done well and has planned accordingly; however, she may face a sizable tax liability at her death. Teresa sees that a sound life insurance strategy is her best course of action. She also understands that at her age and profile, this is likely that last time she can secure insurance coverage that is not cost prohibitive. Some of the income, dividends and interest from Teresa's trust assets will pay for the cost of insurance to offset the future tax liability.

Attached is a graphical interpretation showing Teresa's estate growth over her life expectancy. According to IRC 1.401(a)(9)(2006), the life expectancy of Teresa, is roughly 12 years. Assuming historical growth factors with this life expectancy, her estate will have grown approximately $14,600,000 thereby exposing the estate an estimated tax liability of about $7,600,000 (Federal + State). Please see the enclosure to see the estate growth and tax projection at various years from 2008 to 20020. Assuming an extremely conservative growth rate of only 6% per annum, then at Teresa's life expectancy of more than 12 years, her estate.

Another concern for Teresa is the potential of long-term healthcare cost for Teresa in the event that she becomes incapacitated due to illness. If we assume a conservative $150k per year cost of care and very conservative 3% inflation factor, then there is a potential future healthcare cost of an excess of $2M. Again, this applied for life insurance would help insulate her estate against the potential financial calamity.

Teresa is in need of a life insurance coverage strategy to protect her estate from latent estate tax exposure and aid in a prudent and strategic financial plan for today while also planning for the future. At very reasonable estate growth, Teresa has projected tax liability in excess of $7,600,000. Teresa has a sincere sense of matriarchal duty towards her family and she believes that her life insurance is the most appropriate vehicle to fulfill her noble wishes to preserve her estate that she worked her entire life to build.

As a result of Teresa's age and health, she understands the window for acquiring affordable life insurance will be closing in the near future. Despite greater need, Teresa is only applying for a $4,000,000 policy, as this is an amount she is comfortable funding for.

Respectfully,

Ed

Please print responsibly

CONFIDENTIAL

3

# Estimated Estate Tax Analysis

This is based on estate growth at 6% percent, over a period (LE) of 12 years.

| | |
|---|---|
| Trust Investment asset | $8.046.288 |
| • Trust assets debt | $644.827 |
| • Trust assets less debt | $7.401.461 |
| ≃ Net Estate Appreciated over Life Expectancy | $14.225.631 |

Tentative tax libility

| | |
|---|---|
| -   = Probate, state tax and final expenses | $1.707.076 |
| -   = Federal estate tax liability | $5.690.253 |
| Total tax liability | $7.397.328 |
| -    Estate reduction due to taxes | 52.00 % |

# Estate Distribution



**48 %**
Amount to
Heirs

**52%**
Taxes and
Expenses

# EXHIBIT C

# WILLIAM KLEIN

## CERTIFIED PUBLIC ACCOUNTANT

June 15, 2008

Wayne H. Bursey, Trustee
NOVA Group, Inc.
100 Griss Mill Road
Simsbury, CT 06070

Re: Teresa Martinez

Dear Mr. Bursey:

I have compiled a statement of financial condition of Teresa Martinez as of this date in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Financial Planners/Certified Public Accountants. The financial statement is intended to present the assets of Teresa Martinez at estimated currents values and their liabilities at estimated current amounts.

A compilation is limited to presenting in the form of financial statements information that is the representation of the trust whose financial statement is presented. This compilation includes all business interest values, trust accounts and personal net worth. The personal assets and liabilities result in a net worth estimated at $7,400,000.

I understand that this statement is for the purpose of Life Insurance and for the adoption of a Welfare Benefits Trust Program to ultimately benefit family and loved ones. If the insurance carrier has any questions regarding the estimated net worth statement of Teresa Martinez, please do not hesitate to call me.

### Financial Statement (Attached)

# Statement

## CONFIDENTIAL

**Assets**

Residence                                    $120,000
Real Estate
Business Investments
Partnership                                  $7.881.288
Portfolio
  • Cash                $6.888
  • Stocks           $5.123.000
  • Bonds           $2.751.400
  • Other
Collectables
Other                                        $45.000
Retirement
  • IRA
  • 401K             $45.000

**Total Assets**                             $8.046.288


**Liabilities**

Mortgages
Personal Debt
Business Debt                                $644.827
Other
**Total Liabilities**                        $644.827

**Net Worth**                                $7.401.461


Please let me know if you need any additional information.

*William Klein*

*William Klein, CPA*
CPA No; 20854

# EXHIBIT D

CHECK BOX OF APPLICABLE COMPANY

☐ The Penn Mutual Life Insurance Company
   Philadelphia, PA 19172

**Confidential Financial Statement**

☐ The Penn Insurance and Annuity Company
   Philadelphia, PA 19172

## Instructions:

To be submitted with Application for $1,500,000 and up or at Underwriting Department discretion.
For amounts over $4,999,999 an inspection report will be required. Please be sure to advise the proposed insured
of this requirement.

For amounts of $3,000,000 or more also submit Financial Statements for the last two years (Personal or busi-
ness, depending on the purpose of the insurance)*.

* For personal insurance, a year-end review by the personal accountant; for business insurance, such documents as
income statments, profit and loss statements, balance sheets, and year-end financial reviews.

_Teresa  Martinez_                                    _1 / 930_
Proposed Insured                                      Date of Birth

## PART I - Personal Insurance

### Purpose of Insurance:

☐ Family Protection        ☑ Estate Conservation

☐ Debt Repayment (give details such as loan amt. and duration)_____

☐ Other (specify)_____

### Personal Income:

$ _2,000_ Annual Earned Income   $ _300,000_ Other Income   $ _301,000_ Total Income

Bankruptcy: Have you been involved in any kind of bankruptcy in past 7 years?

☐ Yes  ☑ No (If yes, give full details including type and date discharged.)

### Personal Worth:

| Assets | | Liabilities | |
|---|---|---|---|
| $ _100,000_ | Cash | $_____ | Bank Loans |
| $ _7,800,000_ | Investments | $_____ | Taxes Due |
| $ _120,000_ | Real Estate (residence) | $_____ | Mortgage (residence) |
| $_____ | Other Real Estate | $ _650,000_ | (Other Mortgages |
| $_____ | Business Equity | $_____ | Business Indebtedness |
| $_____ | Notes/Acct. Receivable | $_____ | Notes/Acct. Payable |
| $_____ | Life Ins. (cash value) | $ . | Insurance Loans |
| $_____ | Automobiles | $_____ | Other (specify) |
| $ _45,000_ | Other (specify) | | |

$ _8,065,000_ Total Assets          $ _650,000_ Total Liabilities

Net Worth:   $ _8,065,000_ Total Assets
(minus)      $ _650,000_ Total Liabilities

             $ _7,500,000_ Net Worth

_5/23/08_                  _Teresa Martinez_
Date                       Signature of Proposed Insured

**OVER FOR BUSINESS COVERAGE**